UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALFRED CLEVELAND, | ) | Case No. 1:10CV0148 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | JUDGE JACK ZOUHARY |
| | ) | (Magistrate Judge McHargh) |
| MAGGIE BRADSHAW, | ) | |
| Warden, | ) | |
| | ) | |
| Respondent. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| | ) | |

McHARGH, Mag.J.

The petitioner Albert Cleveland[1] ("Cleveland") has filed a petition pro se for a

writ of habeas corpus, arising out of his 1996 jury conviction for aggravated murder

in the Lorain County (Ohio) Court of Common Pleas.  In his petition, Cleveland

raises six grounds for relief:

> 1. Alfred Cleveland is actually innocent of Marsha Blakely's murder.
> His conviction violates the U.S. Constitution.  U.S. Const. Amend. V,
> VIII, XIV.

> 2.  Alfred Cleveland's due process rights were violated because the
> State presented testimony at trial that it knew or should have known
> was false in violation of the United States Constitution.  U.S. Const.
> Amend. XIV; Napue v. Illinois, 360 U.S. 264 (1959).

---

[1]  Cleveland is occasionally referred to as "Al Monday."

3.  The State violated Alfred Cleveland's due process rights when it failed to disclose favorable evidence.  U.S. Const. Amend. V, XIV; Brady v. Maryland, 373 U.S. 83 (1963).

4.  Alfred Cleveland's substantive and procedural due process rights to a fair trial were violated because the prosecutor committed acts of misconduct during the trial.  U.S. Const. VIII, XIV; Berger v. United States, 295 U.S. 78 (1935).

5.  Alfred Cleveland was prejudiced by his trial counsel's deficient performance.  U.S. Const. Amends. VI and XIV; Gideon v. Wainwright, 372 U.S. 335 (1963).

6.  Alfred Cleveland's due process rights were violated because appellate counsel failed to render effective assistance in his first appeal of right.  U.S. Const. Amend. XIV.

(Doc. 1, § 12.a.)


## I.  FACTUAL AND PROCEDURAL BACKGROUND

The Ohio Court of Appeals set forth the following factual and procedural background:

> Marsha Blakely's body was discovered in an alley in Lorain during the summer of 1991.  She had fractured ribs and a broken neck.  Her throat had also been cut, and she had torture-type wounds on the side of her neck and head.  A witness to the murder eventually came forward, describing in detail the events of that fateful night.  The witness' statement implicated the group of men responsible, one of whom was Defendant.

> Defendant was indicted for the aggravated murder of Ms. Blakely.  He was arrested and arraigned in May of 1995.  The prosecution filed its discovery that same month.  A jury trial was set for August, but was later continued until January.

> In September, the defense filed a motion to compel discovery of certain enumerated items.  The trial court initially granted the motion, but

2

later reconsidered its decision upon the motion of the prosecution and after conducting a hearing.  At the hearing on the discovery matter, defense counsel withdrew some of her requests and agreed to resubmit an appropriate evidentiary list.  The list was submitted on January 22, 1996, the day before trial.  Included on the list was a videotape of the crime scene and photographs of the apartment where the victim had allegedly been beaten prior to her ultimate demise.

On the morning of trial, the court held another discovery hearing.  The prosecutor stated that he had just received the list, and averred that the videotape was not in the courthouse.  It was agreed, however, that the videotape would be provided to the defense for viewing that evening.  No mention was made of the photographs.

Trial began as scheduled.  It lasted six days, and included the foregoing witness' testimony explaining Defendant's participation in the death of Ms. Blakely.  The defense began presenting evidence on the third day of trial.  Defense counsel never sought to introduce the videotape which she had watched at the conclusion of the first day.  The jury, nevertheless, had the opportunity to view the tape through its admission by the prosecution.  After two days of deliberations, Defendant was found guilty as charged in the indictment.

(Doc. 10, RX 8, at 1-3; State v. Cleveland, No. 96CA006357, 1997 WL 104653, at *1 (Ohio Ct. App. Mar. 5, 1997).)

### A.  Direct Appeal

Cleveland filed a timely appeal of his conviction, and set forth the following four assignments of error:

1. The trial court erred by not compelling the State of Ohio to provide the defense with discoverable and exculpatory evidence in a timely manner.

2.  The court erred when it failed to declare a mistrial and strike from the record improper statements which referenced Mr. Cleveland's prior criminal record, illicited [sic] by the state upon direct examination of it's [sic] witnesses.

3

3.  The judgment and conviction below should be reversed due to blatant prosecutorial misconduct based upon the state withholding exculpatory evidence essential to the defendant's case and the improper demeanor of the prosecutor.

4.  The defendant's conviction for aggravated murder was against the manifest weight of the evidence presented during trial.

(Doc. 10, RX 6.)  On March 5, 1997, the court of appeals affirmed the judgment of the trial court.  (Doc. 10, RX 8; State v. Cleveland, No. 96CA006357, 1997 WL 104653, at *1 (Ohio Ct. App. Mar. 5, 1997).)

Cleveland filed a motion for leave to file a delayed appeal to the Supreme Court of Ohio on May 9, 1997, which would have set forth the following four propositions of law:

1. The trial court erred and abused its discretion, to the prejudice of appellant, by failing to compel the State of Ohio to provide the defense with discoverable and exculpatory evidence in a timely manner, which deprived the appellant the right to a fundamental fair trial, and violated his rights protected by the Due Process Clause of the Fifth and Fourteenth Amendment[s] to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

2. The trial court erred and abused its discretion, to the prejudice of appellant, by failing to declare a mistrial and strike from the record improper statements which referenced appellant's prior criminal record, illicited [sic] by the state upon direct examination, which deprived appellant the right to a fundamental fair trial, and violated appellant's rights protected by the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

3.  Appellant was denied the right to a fundamental fair trial due to prosecutorial misconduct based upon the state withholding exculpatory evidence essential to the appellant's case and the improper demeanor of the prosecutor, which violated appellant's rights protected by the Due Process Clause of the Fifth and Fourteenth Amendments to the

4

United States Constitution and Article I, Sections 10 and 16 of the
Ohio Constitution.

4.  The defendant's conviction for aggravated murder was against the
manifest weight of the evidence presented during trial, which violated
appellant's rights protected by the Due Process Clause of the Fifth and
Fourteenth Amendments to the United States Constitution and Article
I, Sections 10 and 16 of the Ohio Constitution.

(Doc. 10, RX 9.)  On July 2, 1997, the state supreme court denied leave to file a

delayed appeal.  (Doc. 10, RX 10; State v. Cleveland, 79 Ohio St.3d 1448, 680

N.E.2d 1021 (1997).)

## B.  Delayed Rule 26(B) Application

On July 14, 1997, Cleveland filed a delayed application pro se to reopen his

appeal, pursuant to Ohio App. Rule 26(B).  The application was based on ineffective

assistance of appellate counsel on three grounds:

1.  Appellant was denied the effective assistance of appellate counsel
by appellant counsel's failure to raise the issue that she, as trial
counsel prejudicially deprived appellant of his right to a speedy trial,
once appellant had demanded a speedy trial and the trial court had set
the trial date to comply with the speedy trial provisions.

2. Appellant was denied his constitutional right to a fair trial due to
prosecutorial misconduct in that during trial the prosecutor falsely
accused appellant of other criminal acts, having full knowledge that
the accusations were untrue, and that such accusations would
prejudice the jury.

3. Appellant's conviction for aggravated murder was against the
manifest weight of the evidence presented during trial.

(Doc. 10, RX 11.)  The court of appeals found his application to be barred as

untimely.  (Doc. 10, RX 12.)

Cleveland filed a timely appeal to the Supreme Court of Ohio on Sept. 8,

1997, which set forth the following three propositions of law:

> 1. Where trial counsel and appellate counsel are the same and appellate counsel fails to raise on appeal the fact that while acting as trial counsel she prejudicially deprived Appellant of his right to a speedy trial, the Appellant is denied the effective assistance of appellate counsel.
>
> 2. A defendant is denied his constitutional right to a fair trial, where the prosecutor during trial falsely accuses the defendant of other criminal acts the prosecutor knows to be false.
>
> 3. Where on direct appeal appellate counsel raises the claim that the Appellant's conviction was against the manifest weight of the evidence and appellate counsel fails to order the entire record, and a crucial part of the record is missing from the record on appeal, the Appellant has been denied the effective assistance of appellate counsel.

(Doc. 10, RX 14.)

On Nov. 12, 1997, the state supreme court denied leave to appeal and

dismissed the case because it did not involve any substantial constitutional

question.  (Doc. 10, RX 15; State v. Cleveland, 80 Ohio St.3d 1447, 686 N.E.2d 274

(1997).)

### C.  Motion for New Trial

On Dec. 3, 1996, while his direct appeal was pending, Cleveland filed a

motion for a new trial under Ohio Cr. Rule 33(A)(6), and a motion for leave to file a

delayed motion for same.  (Doc. 10, RX 16-17.)  In his motion for a new trial,

Cleveland indicates that he would offer evidence as outlined in the affidavit of

Jerimah Abdullah (formerly, Jeremiah A. Charlton).  (RX 16, at 4.)  In his affidavit,

Abdullah presents a lengthy narrative of his version of the events of the day

6

Blakely was murdered, and his opinion that Cleveland was not the murderer.  (RX 16, exh. A, Abdullah aff.)

The state responded that the court should treat his motion as a petition for post-conviction relief, and set the matter for a hearing, noting that Abdullah's trial testimony, as well a former statement, contradicted his affidavit.  (Doc. 10, RX 18.)

The court held a hearing on the motion on June 9, 1997, but denied the motion "as defendant failed to produce evidence" at the hearing in support of his motion.  (Doc. 10, RX 19.)

Cleveland filed an appeal on July 8, 1997, set forth two assignments of error:

> 1.  The Appellant was denied procedural due process and the trial court abused its discretion and erred to the prejudice of Appellant when it denied Appellant's motion for a new trial filed pursuant to Cr. Rule 33(A)(6).

> 2.  A defendant is deprived of his constitutional right to due process of law and his right to a fair trial when the prosecution withholds from the defense favorable evidence that is material to the outcome of the trial.

(Doc. 10, RX 21.)  The court of appeals affirmed the judgment of the trial court, noting that:

> The record does not contain a transcript of the hearing on Cleveland's motion for a new trial.  Thus, there is nothing in the record to contradict the trial court's conclusion that Cleveland failed to produce evidence at the hearing.  Additionally, the prosecution claims, and Cleveland does not dispute, that no evidence was offered at this hearing.

(Doc. 10, RX 24, at 2-3; State v. Cleveland, No. 97CA006840, 1998 WL 162855, at *1 (Ohio Ct. App. Apr. 8, 1998).)

<u>D.  Petition for Post-Conviction Relief</u>

Almost ten years later, Cleveland filed a petition for post-conviction relief,

pursuant to <u>Ohio Rev. Code § 2953.21</u>, with the trial court on July 6, 2006.  The

petition was based on six grounds:

> 1.  Freestanding actual innocence mandating relief under the Federal
> Constitution and the Ohio Constitution.
>
> 2.  Use of testimony at trial which the State knew or should have
> known to be false in violation of the Federal Constitution and the Ohio
> Constitution.
>
> 3.  Suppression of favorable evidence in violation of the Federal
> Constitution and the Ohio Constitution.
>
> 4.  Prosecutorial misconduct.
>
> 5.  Ineffective assistance of counsel in violation of the Federal
> Constitution and the Ohio Constitution.
>
> 6.  Violations of the Confrontation Clause mandating relief pursuant to
> the retroactive application of <u>Crawford v. Washington (2004), 541 U.S.
> 36</u>.

(Doc. 10, <u>RX  25</u>, <u>28</u>.)  At the same time, Cleveland filed a motion to hold <u>Ohio Rev.

Code § 2953.23</u> unconstitutional (doc. 10, <u>RX 29</u>), and a motion for leave to depose

William Avery, Jr. ("Avery") (doc. 10, <u>RX 30</u>).  Cleveland subsequently withdrew the

sixth ground of the petition for post-conviction relief.  (Doc. 10, <u>RX 38</u>.)

The trial court denied in part, and granted in part, his petition for post-

conviction relief.  The court set a hearing for Jan. 31, 2008, to consider the

testimony of Avery.  (Doc. 10, <u>RX 39-40</u>.)  The court denied the motion to hold Sect.

2953.23 unconstitutional.  (Doc. 10, RX 41.)  On the date at which the hearing was to take place, the court entered the following journal entry, in part:

> The Court had previously limited its consideration . . . to a sole ground/claim, that involving the allegedly recanted testimony of the State's witness, William M. Avery, Jr.
>
> When called as a witness by the Defendant/Petitioner Mr. Avery, after lengthy consideration and consultation with court-appointed counsel, chose to invoke his rights pursuant to the Fifth Amendment . . . and did not testify.  No other witnesses were called.

(Doc. 10, RX 42; see also RX 49, transcript of hrg.)  The parties were granted the opportunity to provide the court with memoranda in support of their positions.  Id. Both sides filed memoranda with supporting exhibits.  (Doc. 10, RX 43-45.)  In addition, Cleveland filed a motion to reopen the hearing.  (Doc. 10, RX 46.)

On April 25, 2008, the trial court denied the motion for new trial and petition for post-conviction relief, as well as the motion to reopen the hearing.  (Doc. 10, RX 50.)  Cleveland appealed this determination.  (Doc. 51-52.)

On appeal, Cleveland raised nine assignments of error:

> 1.  The Trial Court erred in hold that claims of freestanding actual innocence are not a cognizable ground for relief under the Federal Constitution and the Ohio Constitution.
>
> 2.  The Trial Court erred in dismissing Petitioner's claims for post-conviction relief when Petitioner had satisfied the jurisdictional requirements of Ohio Rev. Code § 2953.23.
>
> 3.  The Trial Court erred in overruling Petitioner's motion to hold Ohio Rev. Code § 2953.23 unconstitutional.
>
> 4.  Petitioner's rights under the Ohio Constitution and the Federal Constitution to compulsory process, due process of law and due course

of law were violated when the prosecution deliberately interfered with the decision of a defense witness to testify.

5. The Trial Court erred in advising William Avery Jr. that he could be subject to criminal liability for perjury, and in permitting Avery Jr. to invoke his right against self-incrimination, when the statute of limitations for the perjury offenses in question had expired.

6. The trial court erred in denying Petitioner's motion to reopen the evidentiary hearing.

7. Petitioner's rights under the Ohio Constitution and the Federal Constitution to compulsory process, due process of law and due course of law were violated when the Trial Court questioned William Avery Jr. in an impermissibly coercive manner.

8. The Trial Court erred in denying Petitioner's motion for leave to bring a motion for new trial with regard to various claims.

9. The Trial Court erred in denying Petitioner's motion for a new trial.

(Doc. 10, RX 52.) The court of appeals affirmed the judgment of the trial court on

Feb. 2, 2009. (Doc. 10, RX 55; State v. Cleveland, No. 08CA009406, 2009 WL

224505 (Ohio Ct. App. Feb. 2, 2009).)

As to Avery, the court of appeals stated the following:

The only evidence of Avery's recantation is in his affidavit and "deposition[2]." Consequently, his "recantation" was never subject to cross-examination. Further, when given the opportunity in court, Avery was unwilling to take the witness stand to testify under oath to statements he made in his affidavit. Instead, Avery asserted his Fifth Amendment right not to incriminate himself. The trial court viewed Avery's affidavit and "deposition" with "the utmost suspicion" and reasonably inferred that the statement contained in the affidavit

---

[2] The court noted that the "deposition" was an interview conducted by an investigator in the presence of a court reporter. There were no attorneys present at the "deposition." (Doc. 10, RX 55, at 4 n.2; Cleveland, 2009 WL 224505, at *2 n.2.)

10

and/or "deposition" were untrue and that Avery sworn trial testimony was true.

Avery gave consistent lengthy testimony, subject to vigorous cross-examination, in the five Blakely trials before recanting several years later. A careful review of the affidavit and deposition reveals inconsistencies regarding Avery's explanation of his trial testimony. Avery avers that the trial testimony was based on a story fabricated by his father while also contending that he created his version of the murder after viewing crime scene photos supplied to him by law enforcement officials. These inconsistencies provide yet another basis for the trial court to believe Avery's trial testimony and disbelieve his recantations.

Furthermore, Detective Taliano's affidavit further negates the credibility of Avery's contention that he was only able to describe the crime scene after law enforcement officials showed him photographs. Detective Taliano specifically testified that in his initial meeting with Avery, Avery was able to relate specific details of the crime scene that he could only have known had he been present during the murder. Detective Taliano swore that he never showed Avery any crime scene photos.

In addition, we are mindful that we must give deference to the trial court's assessment of Avery's credibility. Upon its review of Avery's testimony in the five previous trials, his affidavit and "deposition," the trial court determined that Avery's recantation was false.

(Doc. 10, RX 55, at 26-27 (citations omitted); Cleveland, 2009 WL 224505, at *15-*16.)

Cleveland appealed to the Supreme Court of Ohio, setting forth seven propositions of law:

1. Freestanding claims of actual innocence are cognizable under the Federal Constitution and the Ohio Constitution.

2. A Petitioner who satisfies the jurisdictional requirements of Ohio Rev. Code § 2953.23 is entitled to have his constitutional claims adjudicated on the merits.

11

3.  Ohio Rev. Code § 2953.23 violates the Ohio Constitution and the
Federal Constitution.

4.  The Ohio and Federal Constitutions prohibit the prosecution from
deliberately interfering with the decision of a defense witness to
testify.

5.  A statute of limitation is not tolled if any competent person has
knowledge of the corpus delicti.

6.  A defendant must be granted leave to move for a new trial where he
has satisfied the jurisdictional requirements of Crim.R. 33(B).

7.  A new trial must be granted when newly discovered evidence would
unquestionably result in an acquittal.

(Doc. 10, RX 57.)

On June 17, 2009, the state supreme court denied leave to appeal and

dismissed the case because it did not involve any substantial constitutional

question.  (Doc. 10, RX 59; State v. Cleveland, 122 Ohio St.3d 1410, 907 N.E.2d

1194 (2009).)

Cleveland filed this petition for a writ of habeas corpus on Jan. 21, 2010.

(Doc. 1.)


## II.  HABEAS CORPUS REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of

1996 (AEDPA), 28 U.S.C. § 2254, which provides the standard of review that federal

courts must apply when considering applications for a writ of habeas corpus.  Under

the AEDPA, federal courts have limited power to issue a writ of habeas corpus with

respect to any claim which was adjudicated on the merits by a state court.  The

Supreme Court, in Williams v. Taylor, provided the following guidance:

> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied -- the state-court adjudication resulted in a
> decision that (1) "was contrary to ... clearly established Federal law, as
> determined by the Supreme Court of the United States," or (2)
> "involved an unreasonable application of ... clearly established Federal
> law, as determined by the Supreme Court of the United States."
> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached
> by this Court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies the correct
> governing legal principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2002).  See also Lorraine v. Coyle, 291

F.3d 416, 421-422 (6th Cir. 2002), cert. denied, 538 U.S. 947 (2003).

The task of a federal habeas court is not to overturn state court judgments by

substituting the judgment of this court.  Neace v. Edwards, No. 02-4079, 2005 WL

1059274, at *6 (6th Cir. May 6, 2005) (citing Barefoot v. Estelle, 463 U.S. 880, 887

(1983)).  Federal district courts are not simply another level of "appellate tribunals

to review alleged errors in state court judgments of conviction."  Baker v. Reid, 482

F.Supp. 470, 471 (S.D. N.Y. 1979).  Rather, the question before this federal habeas

court is whether the state court decision was contrary to, or involved an

unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States.  Williams, 529 U.S. at 412-413.

13

A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Williams, 529 U.S. at 405. See also Price v. Vincent, 538 U.S. 634, 640 (2003).

A state court decision is not unreasonable simply because the federal court considers the state decision to be erroneous or incorrect. Rather, the federal court must determine that the state court decision is an objectively unreasonable application of federal law. Williams, 529 U.S. at 410-12; Lorraine, 291 F.3d at 422.

## III. STATUTE OF LIMITATIONS

The respondent argues that Cleveland's petition should be barred because it was untimely filed. (Doc. 10, at 11-14.)

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a state prisoner seeking a federal writ of habeas corpus to file his petition within one year after his state conviction has become "final." Carey v. Saffold, 536 U.S. 214, 216 (2002) (citing 28 U.S.C. § 2244(d)(1)(A). The conviction becomes final "by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Thus, the one-year statute of limitations does not begin to run until all direct criminal appeals in the state system are concluded, followed by either completion or denial of certiorari before the United States Supreme Court, or the expiration of the time allowed (90 days) for filing for certiorari. Clay v. United States, 537 U.S. 522, 528 n.3 (2003); Anderson v.

14

Litscher, 281 F.3d 672, 675 (7th Cir. 2002); Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001), cert. denied, 534 U.S. 924 (2001) (citing cases).  However, a habeas petitioner filing for collateral relief does not benefit from the 90 day certiorari period.  Lawrence v. Florida, 549 U.S. 327 (2007) (interpreting 28 U.S.C. § 2244(d)(2)).

### A.  Direct appeal

The state court of appeals affirmed Cleveland's conviction on March 5, 1997. (Doc. 10, RX 8; Cleveland, 1997 WL 104653.)  Cleveland did not seek timely review by the Ohio Supreme Court within 45 days, pursuant to Ohio Supreme Court Rule of Practice II, Section 2(A)(1).  Thus, Cleveland's conviction became "final" within the ordinary meaning of AEDPA on April 20, 1997.  Searcy v. Carter, 246 F.3d 515, 517 (6th Cir.), cert. denied, 534 U.S. 905 (2001).  Accordingly, the statue of limitations for filing his habeas petition would have expired on April 20, 1998.

### B.  Delayed appeal to state high court

Cleveland filed a motion for leave to file a delayed appeal to the Supreme Court of Ohio on May 9, 1997.  (Doc. 10, RX 9.)  The filing of the motion for a delayed appeal is considered collateral review, which, if properly filed, tolls the running of the one-year period.  DiCenzi v. Rose, 452 F.3d 465, 468 (6th Cir. 2006); Searcy, 246 F.3d at 519; Sanders v. Bobby, No. 5:07 CV 682, 2008 WL 276415, at *3 (N.D. Ohio Jan. 31, 2008).  See generally Lawrence, 549 U.S. at 332.  The state high court denied leave to file a delayed appeal on July 2, 1997.  (Doc. 10, RX 10.) Thus, the statute would have been tolled for 54 days during the pendency of his

15

motion for leave.  The statute of limitations as tolled would ordinarily have expired on June 13, 1998.

### C.  Pending motion for new trial

However, Cleveland had filed a motion for a new trial on Dec. 3, 1996 (doc. 10, RX 16-17), which was still pending during this time.  The proceedings on that motion, which included a hearing, did not conclude until the court of appeals denied his appeal on April 8, 1998.  (Doc. 10, RX 24.)  Cleveland did not seek timely review by the Ohio Supreme Court within 45 days (i.e., by May 23, 1998), thus, Cleveland's conviction became "final" within the meaning of AEDPA at that time, and the limitations period expired one year later, on May 23, 1999.

### D.  Untimely Rule 26(B) application

Cleveland had filed a delayed application to reopen his appeal, pursuant to Ohio App. Rule 26(B) (doc. 10, RX 11), on July 14, 1997, which the court of appeals found to be barred as untimely (doc. 10, RX 12).  Subsequently, the Ohio Supreme Court dismissed his appeal of that determination.  (Doc. 10, RX 15.)  This untimely application does not affect the limitations period.

The limitations period is tolled while "properly filed" state post-conviction or collateral proceedings are pending.  Souter v. Jones, 395 F.3d 577, 585 (6th Cir. 2005); Searcy, 246 F.3d at 517-518; 28 U.S.C. § 2244(d)(2).  However, an untimely post-conviction or collateral motion is not considered "properly filed" so as to toll the running of the statute of limitations.  Allen v. Siebert, 552 U.S. 3 (2007) (per curiam) (affirming Pace v. DiGuglielmo, 544 U.S. 408 (2005)); Williams v. Wilson,

16

No. 03-4404, 2005 WL 2175914, at *3 (6th Cir. Aug. 9, 2005), cert. denied, 547 U.S. 1152 (2006).

Under Ohio law, a Rule 26(B) motion to reopen must be filed in the court of appeals within 90 days of the appellate judgment.  State v. Lamar, 102 Ohio St.3d 467, 468, 812 N.E.2d 970 (2004) (per curiam), cert. denied, 543 U.S. 1168 (2005); State v. Reddick, 72 Ohio St. 3d 88, 90, 647 N.E.2d 784, 786 (1995) (per curiam).  The appellate judgment at issue was entered on March 6, 1997.  (Doc. 10, RX 8; Cleveland, 1997 WL 104653.)  The motion to reopen should have been filed by June 3, 1997.  (Doc. 10, RX 12, at 1.)  Cleveland's application to reopen was not filed until July 14, 1997.  (Doc. 10, RX 11.)

Cleveland's application was rejected as untimely.  (Doc. 10, RX 12.)  Cleveland's untimely Rule 26 motion to re-open his appeal does not toll the limitations period.  Siebert, 552 U.S. at 7; Kimble v. Gansheimer, No. 4:08CV01048, 2009 WL 4676959, at *14 (N.D. Ohio Dec. 4, 2009).

The statute of limitations period (as properly tolled) ran until May 23, 1999.

E.  Petition for post-conviction relief and motions filed in July 2006

Cleveland filed a petition for post-conviction relief, a motion for a new trial, and related motions, on July 6, 2006.  (Doc. 10, RX 25, 28-30.)  Although filing a post-conviction or collateral motion may toll the running of a pending, unexpired one-year limitations period, Souter, 395 F.3d at 585, it will not "revive" the statute, or cause it to begin running anew.  Cordle v. Guarino, 428 F.3d 46, 48 n.4 (1st Cir. 2005); Hill v. Randle, No. 00-4168, 2001 WL 1450711, at *2 (6th Cir. Nov. 7, 2001);

Searcy, 246 F.3d at 519.  The statute of limitations period had expired several years

previously, in May 1999.

In summary, the statute of limitations, as tolled by the 1996 motion for a new

trial, expired in May 1999.  Because Cleveland did not file his petition for a writ of

habeas corpus until Jan. 21, 2010, he did not file his habeas petition within the one

year limitation period.  The petition was untimely filed.


IV.  SECTION 2244(d)(1)(D)

Cleveland also argues that he should be entitled to a later start date of the

limitations period under Section 2244(d)(1)(D).  (Doc. 13, at 18-19.)

Under 28 U.S.C. § 2244(d)(1)(D), the limitations period begins on "the date on

which the factual predicate of the claim or claims presented could have been

discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  The

limitations period under Section 2244(d)(1)(D) does not begin "when a prisoner

actually understands what legal theories are available."  Owens v. Boyd, 235 F.3d

356, 359 (7th Cir. 2000).  Accord Townsend v. Lafler, No. 02-2151, 2004 WL

1098757 (6th Cir. May 14, 2004), cert. denied, 543 U.S. 1062 (2005).  Rather, the

year "begins when the prisoner knows (or through diligence could discover) the

important facts, not when the prisoner recognizes their legal significance."  Id.  See

also Earls v. Hernandez, 403 F.Supp.2d 985, 989 (C.D. Cal. 2005) (citing cases).

In cases involving an affidavit of a recanting witness, "the limitations period

begins when the petitioner knew or could have discovered that the witness was

willing to recant his or her testimony, not when the affidavit is executed." Bates v. Metrish, No. 07-11073, 2010 WL 1286413, at *9  (E.D. Mich. Mar. 30, 2010) (citing cases).  See, e.g., Deloney v. McCann, No. 06-2297, 2007 WL 1175758, at *2 (7th Cir. Apr. 18, 2007) (limitations period began running when petitioner became aware of facts underlying claim, not when he obtained evidence to support it); Sistrunk v. Rozum, Civ. No. 06-5630, 2009 WL 1089557, at *4 (E.D. Penn. Apr. 21, 2009).

To benefit from Section 2244(d)(1)(D), the habeas petition must be filed within one year from the date of the discovery.  Coldiron v. Timmerman-Cooper, No. 3:04cv7750, 2007 WL 1813201, at *4 (N.D. Ohio June 19, 2007) (citing DiCenzi v. Rose, 419 F.3d 493, 497-500 (6th Cir. 2005)); Mosley v. Petro, No. 5:04cv726, 2006 WL 2640958, at *5 (N.D. Ohio Sept. 13, 2006).

Cleveland asserts that the factual predicate here is Avery's recantation of his trial testimony, "which occurred on February 9, 2006."  (Doc. 13, at 18.)  First of all, most of the grounds of the petition are not implicated.  Cleveland states that Avery's "recantation occurred on the date that Avery Jr. met with Cleveland's representative and signed an affidavit – February 9, 2006."  Id. at 19.  Clearly, an occurrence which allegedly did not occur until February 2006 would not be a factual predicate for a claim that the state failed to disclose favorable evidence (Ground 3) at the time of Cleveland's jury trial ten years earlier, in January 1996.  Nor could this event be a factual predicate for a claim of prosecutorial misconduct at that same trial (Ground 4), ineffective assistance of trial counsel (Ground 5), or ineffective assistance of appellate counsel (Ground 6).

More importantly, the respondent argues that the date on which the factual predicate (Avery's willingness to recant) could have been discovered through the exercise of due diligence was actually much earlier than February of 2006.  (Doc. 14, at 4.)  The respondent notes that the issue of Avery's recantation of his testimony arose during Cleveland's trial itself.  Id., citing Trial Transcript ("Tr."), at 329-332.

Counsel for Cleveland, in cross-examination of Avery during Cleveland's January 1996 trial, asked "isn't it a fact that you have testified at least on three different occasions under oath concerning this matter?"  (Doc. 10, Tr., Vol. 3, at 324-325.)  In addition, counsel referenced Avery's Sept. 26, 1991, deposition.  Id. at 325-326.  Counsel also noted that Avery testified at the related trial of Lenworth Edwards, in March 1992, and at the trial of Benson Davis, in September 1994.  Id. at 327.

Cleveland was aware of contradictory statements made by Avery in his deposition and at Cleveland's trial.  (Doc. 10, Tr., Vol. 3, at 332-333.)  Counsel also brought out that Avery had earlier recanted his testimony in the related Edwards trial:

> Q.  Isn't it true that you recanted your story . . . when you were testifying in Edwards' trial?
>
> A.  Yes, I did.

(Tr., at 363.)

In fact, Avery's previous recantation, and the issues concerning his testimony could have been discovered, through the exercise of due diligence, simply by viewing the court of appeals' 1992 opinion in the Edwards case:

> At Edwards's [1992] trial, Avery took the stand but refused to testify. The trial court held Avery in contempt, and ordered that he be incarcerated in the county jail until he agreed to testify. Avery later returned to the courtroom, testified that he had lied to the police, and recanted his inculpatory statements. Consequently, the trial court granted Edwards's motion for a mistrial.

> At Edwards's second trial, Avery took the witness stand and explained that his original statements which implicated Edwards had in fact been true. He further explained that he had perjured himself during the first trial because he had been threatened by someone while in the county jail. Avery proceeded to testify, and described in detail how Edwards had participated in the assault and murder of Blakely.

State v. Edwards, No. 92CA005345, 1992 WL 380611, at *1 (Ohio Ct. App. Dec. 16, 1992).

Additional information could have been gleaned from the 1996 appellate opinion in the Davis case:

> On the day of Edwards' trial, Avery stated that he was not going to testify unless he received $10,000. The prosecutor would not agree to pay Avery any more money, so Avery refused to testify. The trial court held Avery in contempt, and ordered that he be incarcerated in the county jail until he agreed to testify. Avery later returned to the courtroom, testified that he had lied to the police and recanted his testimony. Avery claimed that he made everything up in order to collect the reward money. As a result, the trial court granted Edwards' motion for a mistrial.

> At Edwards' second trial, Avery took the witness stand and explained that his original statements which implicated Edwards were in fact true. He further explained that he had perjured himself during the first trial because he had been threatened by Edwards while in the

21

> county jail. Avery proceeded to testify, describing in detail how
> Edwards had participated in the assault and murder of Blakely.

State v. Davis, No. 94CA005989, 1996 WL 121998, at *2 (Ohio Ct. App. Mar. 20, 1996). As mentioned earlier, counsel for Cleveland was clearly aware that Avery had testified in these two cases. (Doc. 10, Tr., Vol. 3, at 327, 363.) Thus, the court finds that the date on which the factual predicate of the claim (Avery's recantation, and related issues with the credibility or veracity of his trial testimony) could have been discovered through the exercise of due diligence was no later than January 1996, when counsel for Cleveland demonstrated knowledge of this issue at trial.

Cleveland argues that the Feb. 2006 recantation is "substantively different" from the other versions of Avery's story. (Doc. 13, at 22.) The February 2006 affidavit was merely the most recent version of Avery's recantation(s). The factual predicate of Cleveland's claim of innocence, that is, Avery's various recantations, and issues with the veracity of his trial testimony, was known to Cleveland at trial, and long before the year 2006. See, e.g., Sistrunk, 2009 WL 1089557, at *4, *7.

The court finds that Cleveland has not demonstrated that Section 2244(d)(1)(D) is applicable to support a later start date for the statute of limitations.

## V. EQUITABLE TOLLING

Cleveland contends that his untimely filing should be excused through the doctrine of equitable tolling. (Doc. 13, at 24.) The Supreme Court has held that the habeas statute of limitations may be subject to equitable tolling in appropriate

22

cases.  Holland v. Florida, 130 S.Ct. 2549, 2560 (June 14, 2010).  Cleveland bears the burden of persuading the court that he is entitled to equitable tolling.  Griffin v. Rogers, 308 F.3d 647, 653 (6th Cir. 2002); Day v. Konteh, No. 1:08CV0212, 2009 WL 3321388, at *10 (N.D. Ohio Oct. 13, 2009).

To benefit from equitable tolling, the petitioner ordinarily must show that he has been pursuing his rights diligently, and that some extraordinary circumstance stood in his way.  Holland, 130 S.Ct. at 2562 (citing Pace, 544 U.S. at 418); Lawrence, 549 U.S. at 335.  Sixth Circuit case law has consistently held that the circumstances which will lead to equitable tolling are rare.  Souter, 395 F.3d at 590 (quoting Schlup v. Delo, 513 U.S. 298, 321 (1995)); King v. Bell, 378 F.3d 550, 553 (6th Cir. Aug. 3, 2004) (citing Dunlap v. United States, 250 F.3d 1001, 1009 (6th Cir. ), cert. denied, 534 U.S. 1057 (2001)); see also Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir.), cert. denied, 531 U.S. 840 (2000) (rare and exceptional).

## A.  Extraordinary Circumstances

The Sixth Circuit has allowed for equitable tolling based on actual innocence under certain limited and extraordinary circumstances.  McSwain v. Davis, No. 06-1920, 2008 WL 2744640, at *7 (6th Cir. July 15, 2008), cert. denied, 129 S.Ct. 2824 (2009); Souter, 395 F.3d at 597-599.  In Souter, the petitioner was able to point to new evidence, unavailable at the time of his trial, supporting a credible claim of actual innocence.  See, e.g., Souter, 395 F.3d at 583-584, 591-592.  The threshold inquiry was whether the new facts raised sufficient doubt about the petitioner's

guilt to undermine confidence in his conviction.  Souter, 395 F.3d at 590 (quoting

Schlup, 513 U.S. at 317).  Souter stated:

> To establish actual innocence, "a petitioner must show that it is more
> likely than not that no reasonable juror would have found petitioner
> guilty beyond a reasonable doubt."  [Schlup, 513 U.S. at 327].  The
> [Supreme] Court has noted that "actual innocence means factual
> innocence, not mere legal insufficiency."  Bousley v. United States, 523
> U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).  "To be credible,
> such a claim requires petitioner to support his allegations of
> constitutional error with new reliable evidence -- whether it be
> exculpatory scientific evidence, trustworthy eyewitness accounts, or
> critical physical evidence -- that was not presented at trial."  Schlup,
> 513 U.S. at 324, 115 S.Ct. 851.   The Court counseled however, that
> the actual innocence exception should "remain rare" and "only be
> applied in the 'extraordinary case.' "  Id. at 321, 115 S.Ct. 851.

Souter, 395 F.3d at 590; see also Maag v. Konteh, No. 3:05CV1574, 2006 WL

2457820, at *1 (N.D. Ohio Aug. 23, 2006).

It is Cleveland's burden to show that this is "one of those extraordinary cases

where a credible claim of actual innocence has been established by new evidence."

McSwain, 2008 WL 2744640, at *9.  The Supreme Court has emphasized that "the

Schlup standard is demanding and permits review only in the 'extraordinary' case."

House v. Bell, 547 U.S. 518, 538 (2006) (citing Schlup, 513 U.S. at 327).

### B.  New reliable evidence of innocence

To support his claim of equitable tolling, Cleveland must present "new

reliable evidence -- whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence -- that was not presented at trial."

Schlup, 513 U.S. at 324; Souter, 395 F.3d at 590.  The Schlup standard is

"demanding" and applies only in the "extraordinary" case.  House, 547 U.S. at 538 (citing Schlup, 513 U.S. at 327).

The Supreme Court gave several examples of what might constitute "new reliable evidence," namely, "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence."  Schlup, 513 U.S. at 324.  These examples were not meant to be an exhaustive list.  Souter, 395 F.3d at 593 n.8.

However, because Schlup explicitly states that the new evidence must be "reliable," "the habeas court must determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record."  Doe v. Menefee, 391 F.3d 147, 161 (2d Cir. 2004), cert. denied, 546 U.S. 961 (2005).  Therefore, this court must make its own credibility assessment to ascertain whether the new evidence proffered by Cleveland is sufficiently reliable to warrant applying equitable tolling under the Schlup actual innocence standard.  Souter, 395 F.3d at 593 n.8; Amrine v. Bowersox, 238 F.3d 1023, 1029 (8th Cir.), cert. denied, 534 U.S. 963 (2001).

### 1.  Avery's Recantation

Cleveland argues that Avery most recent recantation should be considered "new" evidence if the information in the recantation was not previously available. (Doc. 13, at 26.)  He asserts that Avery's "recantation, standing alone, satisfies the requirement for newly discovered evidence."  Id. at 27.

As to the February 2006 affidavit by Avery recanting his testimony once again, the court notes that "recantations are viewed with extreme suspicion by the

courts." In re Davis, 565 F.3d 810, 825 (11th Cir. 2009) (citing cases); see also

Chavis-Tucker v. Hudson, No. 07-4537, 2009 WL 3232068, at * 9 (6th Cir. Oct. 9,

2009), cert. denied, 130 S.Ct. 1712 (2010) (quoting United States v. Chambers, 944

F.2d 1253, 1264 (6th Cir. 1991)); Webb v. Bell, No. 2:07CV12689, 2008 WL

2242616, at *6 (E.D. Mich. May 30, 2008).  Justice Brennan expressed this opinion

on the subject:

> Recantation testimony is properly viewed with great suspicion. It
> upsets society's interest in the finality of convictions, is very often
> unreliable and given for suspect motives, and most often serves merely
> to impeach cumulative evidence rather than to undermine confidence
> in the accuracy of the conviction. For these reasons, a witness'
> recantation of trial testimony typically will justify a new trial only
> where the reviewing judge after analyzing the recantation is satisfied
> that it is true and that it will "render probable a different verdict."

Dobbert v. Wainwright, 468 U.S. 1231, 1233-1234 (1984) (Brennan, J., dissenting

from denial of certiorari).  The Sixth Circuit has characterized similar affidavits as

"of little value, as they merely recant their trial testimony." Carter v. Mitchell, 443

F.3d 517, 539 (6th Cir. 2006), cert. denied, 549 U.S. 1127 (2007).  See also Byrd v.

Collins, 209 F.3d 486, 508 n.16 (6th Cir. 2000); United States v. Lewis, 338 F.2d

137, 139 (6th Cir. 1964).

Avery's history of recanting and revoking his recantations[3] adds to the inherent unreliability of his most recent recantation.  In addition, the fact that Avery has once more changed the story behind his recantation does not, in the court's view, transform the recantation into "newly discovered evidence."

In the February 2006 affidavit, Avery asserts that "I never witnessed the murder of Marsha Blakely," contrary to his testimony at the trials which convicted Cleveland and the others charged with him.  (Doc. 10, RX 26, exh. A, Avery aff., at 1.)  "All of this was a lie."  Id.  Furthermore, "I testified because my father made me. I was threatened by my father."  Id. at 4.

According to his affidavit, Avery had grown up with Marsha Blakely.  (Avery aff., at 1.)  Avery states that his father knew the victim and that his father would smoke crack and have sex with Marsha Blakely.  Id. at 2.  Avery reports he (Avery) sold drugs for Cleveland and the others, and that he owed money to Cleveland

---

[3]  At Edwards's 1992 trial, Avery took the stand but refused to testify. Edwards, 1992 WL 380611, at *1.  Avery stated that he was not going to testify unless he received $10,000.  Davis, 1996 WL 121998, at *2.  After being held in contempt, he agreed to testify.  Edwards, 1992 WL 380611, at *1.  But, he testified that he had lied to the police, and recanted his inculpatory statements.  Davis, 1996 WL 121998, at *2; Edwards, 1992 WL 380611, at *1.  Avery claimed that he made everything up in order to collect the reward money.  Davis, 1996 WL 121998, at *2.

"At Edwards's second trial, Avery took the witness stand and explained that his original statements which implicated Edwards had in fact been true."  Edwards, 1992 WL 380611, at *1.  He explained that he had perjured himself during the first trial because he had been threatened by Edwards while in the county jail.  Davis, 1996 WL 121998, at *2; Edwards, 1992 WL 380611, at *1.

At Cleveland's trial, he repeated that his reason for recanting during the Edwards trial was because he had been threatened.  (Doc. 10, Tr., Vol. 3, at 363.)

(a.k.a. "Monday").  Id.  However, Avery "never saw Monday act or threaten

violence."  Id.

According to his affidavit, on the night that Blakely was murdered, Avery's

father came over to Charlotte Watkins' house, where Avery was visiting.  According

to Avery's affidavit:

> My dad came over to Charlotte's house and told me Marsha was dead
> and they were going to kill me too.  He said he would tell me how you
> can get out of all this.  He told me that I could say I was a witness.  He
> pulled out some crack and we smoked.  He then told me I had to
> memorize a story.  This continued throughout the day and into the
> next.  The story he told me to tell was that Al Monday [Cleveland]
> came to get money, that Al said to go with him, that we went in car
> together to Floyd Epps, that the rest were there (Will, JR, Shakeem).
> He said to say that Al wanted me to beat Marsha up and did.

(Avery aff., at 2.)  Avery's father set up a meeting with the police.

> He was present during the interview.  They showed me pictures of an
> apartment which they said was Floyd Epps' and asked me to describe
> what happened in the apartment.  I then made up the story of what
> happened in the apartment, based upon the pictures.

(Avery aff., at 3.)  Avery claims he was initially reluctant to pursue this plan:

> I told my Dad that this was wrong, that Al was my friend, that I had
> no reason to think that he would hurt me.  My Dad then said I had to
> go to the police and continue to tell this story or he would kill me, my
> son, and Charlotte, if I told anyone about his plan.  I believed him.

(Avery aff., at 3.)  "The story I testified to at the Deposition and each one of the

trials were the ones my father told me to memorize and tell the police and juries."

Id. at 6.

Avery's revised story, then, is that he was not present when Blakely was

killed.  His father came to him shortly after the murder, and said that "they" were

28

going to kill Avery as well.  Presumably, according to this scenario, Avery's father suspected that Cleveland and the others[4] had killed Blakely for her drug debt, and would next kill Avery.  To avoid having his son killed, Avery's father concocted a story for Avery to memorize, which would put Cleveland and the others in jail.  However, if Avery refused to go along with his father's story, he (the father this time, rather than Cleveland and the others) would kill not only Avery, but his girlfriend and Avery's son.  (Doc. 10, RX 26, exh. A, Avery aff.)

In other words, Avery's father supposedly concocted a story for him to tell to "get out of all this," that is, to avoid being killed by drug dealers to whom he owed money, but if he did not tell the story to avoid being killed by drug dealers, his father would kill him.  Avery avers that he "had no reason to think that [Cleveland] would hurt me" for not paying a drug debt, however, he was afraid that his own father would kill him for refusing to lie.  (Avery aff., at 3.)

Or, his father was motivated by the reward money:  "My Dad said that if I testified to what he told me, he was going to get money."  (Avery aff., at 4.)  "My father wanted all the reward money."  Id. at 3.  The reward being offered at that time was $2,000.  According to Avery's affidavit, his father wanted him to ask the

---

[4]  It is unclear on what basis Avery's father believed that Cleveland or the others were involved in the murder in any way, especially assuming, according to the defense theory, that Cleveland was not even in Lorain on that night.  The only public information known at that point was that Blakely's body had been discovered.

prosecutor for $10,000 during the Edwards trial.[5]  Id.  See also doc. 10, Tr., Vol. 3,

at 320; Davis, 1996 WL 121998, at *2.

> In addition, as noted by the state court of appeals:
>
> A careful review of the affidavit and deposition reveals inconsistencies
> regarding Avery's explanation of his trial testimony.  Avery avers that
> the trial testimony was based on a story fabricated by his father while
> also contending that he created his version of the murder after viewing
> crime scene photos[6] supplied to him by law enforcement officials.
> These inconsistencies provide yet another basis for the trial court to
> believe Avery's trial testimony and disbelieve his recantations.

(Doc. 10, RX 55, at 26-27; Cleveland, 2009 WL 224505, at *15.)  The court also

explained that deference was due to the trial court's assessment of Avery's

credibility.  (Doc. 10, RX 55, at 27; Cleveland, 2009 WL 224505, at *16.)  The trial

court reviewed Avery's testimony in the five previous trials, as well as his affidavit

and determined that Avery's recantation was not credible.  Id. See also Chambers,

944 F.2d at 1264 (trial court had opportunity to observe witness's demeanor and

assess his credibility at trial).

---

[5]  Notably, Avery's 2006 affidavit does not repeat his accusation, supposedly made in 2004, that his father was the actual killer.  See generally doc. 13, at 16-17. Rather, the father's motivation is now either protecting his son, or getting the reward money.  Similarly, Cleveland does not include Avery's father as an "alternate suspect."  Id., at 28.

[6]  The "Detective Bureau Report" indicates that Avery was initially interviewed by the police on Sept. 11, 1991.  (Doc. 11, RX 45, exh. V, at 39.)  Avery was able to provide information concerning the crime scene at that initial interview. Id. at 41.  According to the same report, Avery's description of the crime scene was confirmed by photographs of the sealed apartment subsequently taken on Sept. 18, 1991.  Id.

The credibility of Avery, given the history outlined above, may be seen as problematic.  Those in the best position to assess his credibility, however, were the juries and the judges in the multiple trials concerning the murder of Blakely.  In the Cleveland trial, at least, Avery was subject to cross-examination on many of the issues raised here.  (Doc. 10, Tr., Vol. 3, at 324-369.)  See, e.g., Chambers, 944 F.2d at 1264 (court had opportunity to assess credibility at trial); Carr-Poindexter v. Warden, Lebanon Corr. Inst., No. 3:06CV120, 2009 WL 3276094, at *7 (S.D. Ohio Oct. 9, 2009) (opportunity to cross).  In addition, Cleveland presented alibi witnesses in an attempt to convince the jury that he was in New York City during the relevant time period.  See, e.g. doc. 10, Tr., Vol. 4, at 506-518, and 573-577.  The jury found the prosecution's case convincing, and found Cleveland guilty.  This court's task is not to second-guess the jury's verdict, nor to assess the credibility of any particular witness at trial.

Rather, this court is called upon to determine whether the new evidence proffered by Cleveland is trustworthy, and whether the evidence is sufficiently reliable to warrant applying equitable tolling under the Schlup actual innocence standard.  Souter, 395 F.3d at 593 n.8; Doe, 391 F.3d at 161; Amrine, 238 F.3d at 1029.  After reviewing Avery's recantation on its own merits and in light of the pre-existing evidence in the record, the court does not find the recantation to be "new evidence" sufficiently reliable or trustworthy to support applying equitable tolling.

Cleveland has not demonstrated "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327; Souter, 395 F.3d at 590.  Avery's 2006 affidavit recanting his trial testimony contradicts his detailed testimony at Cleveland's 1996 trial and his September 1991 statements shortly after the murder.  The court finds that a reasonable juror could disbelieve Avery's recantation of his trial testimony, and instead credit his testimony at trial and his Sept. 1991 statements to the police. See, e.g., Gist v. DiGuglielmo, Civ. No. 05-4520, 2009 WL 2616716, at *19 (E.D. Penn. Aug. 25, 2009).

### 2.  Other Evidence

Although Cleveland asserts that Avery's "recantation, standing alone, satisfies the requirement for newly discovered evidence," he also points to additional "evidence compiled since the trial" bolstering his theory of actual innocence.  (Doc. 13, at 27.)  Cleveland lists:

> 1991 flight records demonstrating that Cleveland could not have flown from New York to Lorain in time to commit the murder;
>
> Jeremiah Abdullah and Willie Mincy's statements to police identifying alternate suspects;
>
> testimony and affidavits by Ayasha Teague, Patricia Gaddy, Fontella Mays, Brian Daniels and David Alexander Donaphin placing Cleveland in New York at the time of the murder;
>
> probation records showing that Cleveland was in New York on the date of the murder; and
>
> an affidavit from forensic scientist Larry Dehus linking the murders of Epps, which remains unsolved, and Blakely.

32

(Doc. 13, at 28.)

### a.  Flight records

The respondent points out that the 1991 airline flight schedules have been available all along, and cannot be "newly discovered evidence."  (Doc. 14, at 10.) Contrary to Cleveland's assertion, doc. 13, at 38, airline flight schedules are not evidence that he was in New York at the time of the murder.  (In any event, the court notes that it is possible to drive from Lorain, Ohio, to Queens, New York, in approximately eight hours.)

### b.  Other suspects[7]

As to the statements identifying other possible suspects, this information is not new either.   The respondent points out that the statements of Jeremiah Abdullah [Charlton] were also made in the Edwards trial, and thus available earlier.[8]  (Doc. 10, at 38; doc. 14, at 10.)  In addition, neither statement is evidence of Cleveland's actual innocence.

---

[7]  In listing alternate suspects, Cleveland does not rely on an affidavit by FBI Special Agent William Beachum, relating that Avery supposedly accused his father (in 2004) of Blakely's murder.  Compare doc. 13, at 28, with doc. 13, at 16-17. Additionally, although Cleveland indicates a copy of the affidavit is to be found at "Fed.Ex. at 721," there is no such exhibit in the record.  See doc. 13, at 16 n.91. Therefore, the court is unable to determine its full contents, for example, whether the agent found Avery's story credible, or why the agent apparently did not contact the court or the prosecutor with this accusation.

[8]  The respondent also argues that Charlton's statements are not reliable because of contradictory prior statements.  (Doc. 14, at 10.)  However, those prior statements are not provided in the record.

Cleveland submitted the transcript of an undated interview with "Jerimyah Abdullah" [Charlton] to the state court in support of his petition for postconviction relief.  (Doc. 11, RX 45, exh. N.)  In this unauthenticated interview, Charlton claims that he saw Blakely get into a little RED Chevy Chevette with two Cubans, to exchange sex for crack, on the night of her murder, and that was the last time he saw her alive.  (Doc. 11, RX 45, exh. N, at [11]-[12], [24]; see also RX 16, exh. A, Abdullah aff., at ¶ 9.)

Mincy made a statement to police on the night of the murder, to the effect that he thought he saw Blakely in a WHITE car with two other people earlier that night.  (Doc. 11, RX 45, exh. E.)  However, he was not certain:

> Q.  Where'd you see her in a white station wagon, I don't quite understand, you explain it to me?
>
> A.  The car, was pullin', it was pulling off, it was pulling off as I was coming up.
>
> * * * * *
>
> Q.  OK, so there's two people up front and Marcia's in the back.  You know for sure it was her?
>
> A.  I don't know for sure, that's why I went to the house.

(Doc. 11, RX 45, exh. E, at 3, 7.)  Neither Mincy nor Charlton saw Blakely's murder, so they could not testify as to Cleveland's actual innocence.  In any event, the identification of other possible suspects is not evidence of Cleveland's actual innocence.

34

<u>c.  Alibi testimony</u>

Cleveland presented alibi testimony during his trial, in an attempt to convince the jury that he was actually in New York City at the time of Blakely's murder.  See, e.g. doc. 10, <u>Tr., Vol. 4</u>, at 506-518, and 573-577.  For example, Ayasha Teague states she testified during Cleveland's 1996 trial.  See, e.g., doc. 11, <u>RX 45, exh. Q</u>, at 1.  Her 2005 affidavit is thus not newly discovered evidence.

Cleveland also submitted a 2006 affidavit of David Alexander Donaphin to the state court in support of his petition for postconviction relief.  (Doc. 11, <u>RX 45, exh. R</u>.)  In that affidavit, Donaphin relates that, in 2001, he recalled having a conversation with Cleveland in New York City ten years earlier, about a car that Cleveland owned.  He recalls that the conversation took place between 10 p.m. and midnight on the night of August 7-8, 1991.  He recalls the conversation because it took place after his birthday party, and he was impressed with Cleveland's BMW.  <u>Id.</u>  The court notes that recollections of conversations which occurred a decade earlier are unreliable.

In addition, Cleveland submitted a 2002 affidavit of Brian Daniels in support of his petition for postconviction relief.  (Doc. 11, <u>RX 45, exh. S</u>.)  Daniels was a resident of Lorain at the time of the murder.  He stated that he told the police that he "knew for a fact [Cleveland]  was in New York at the time of the murders."  <u>Id.</u> at ¶ 6.  Daniels knew this to be a fact because "A number of days before Blakely and Epps were killed, I learned from Al Cleveland that he was leaving for a planned trip

to New York." Id. at ¶ 7.  In other words, Daniels assumes that Cleveland was in New York, because that's where he said he was going to go.

If one of Cleveland's main theories of defense was his contention that he was actually in New York City at the time of the murders, that theory was indeed raised at trial, then factual support for this theory is not "newly discovered," in the sense that Cleveland could have discovered additional alibi witnesses within the statutory limitations period.  The discovery of additional alibi witnesses ten years later does not serve to support the application of equitable tolling.  Also, additional alibi witnesses would be "insufficient to demonstrate actual innocence, because [the evidence] would be merely corroborating evidence and would be entirely speculative." Coats v. Curtin, No. 2:07CV12043, 2008 WL 4910572, at *6 (E.D. Mich. Nov. 13, 2008).

### d.  Probation records

Alibi testimony regarding Cleveland's meeting with his probation officer was presented during Cleveland's trial.  (Doc. 10, RX 8, at 7; Cleveland, 1997 WL 104653, at *3.)  Respondent points out that evidence of a meeting on August 7, 1991, does not demonstrate that Cleveland did not participate in the murder of Blakely on August 8.  The jury heard testimony regarding Cleveland's meeting with his probation officer.

### e.  Affidavit from forensic scientist

An affidavit from a forensic scientist linking the unsolved murder of Epps with the murder of Blakely does not constitute evidence of Cleveland's actual

36

innocence.  It is possible that Cleveland was involved in one without necessarily being involved in the other.

## VI.  SUMMARY

The statute of limitations, as tolled by the 1996 motion for a new trial, expired in May 1999.  Because Cleveland did not file his petition for a writ of habeas corpus until Jan. 21, 2010, he did not file his habeas petition within the one year limitation period under 28 U.S.C. § 2244(d)(1)(A).  The petition was not timely filed.

Cleveland has not demonstrated that Section 2244(d)(1)(D) is applicable to support a later start date for the statute of limitations.  The court finds that the factual predicate of the first ground of the petition, based on Avery's recantation, could have been discovered through the exercise of due diligence no later than January 1996, when counsel for Cleveland demonstrated knowledge of this issue at trial.

Finally, Cleveland has failed to meet his burden to show that this is one of those extraordinary cases where a credible claim of actual innocence, to support the application of equitable tolling, has been established by new evidence.  Cleveland has presented no new, reliable evidence to establish that he was actually innocent of the crimes charged.  Avery's 2006 affidavit recanting his trial testimony contradicts his detailed testimony at Cleveland's trial and his statements to the police shortly after the murder.  A  reasonable juror could disbelieve Avery's

recantation of his trial testimony, and instead credit his testimony at trial and his Sept. 1991 statements to the police.

Cleveland has not demonstrated "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," in light of the alleged "new evidence." Schlup, 513 U.S. at 327; McCray v. Vasbinder, 499 F.3d 568, 572 (6th Cir. 2007), cert. denied, 128 S.Ct. 1236 (2008); Souter, 395 F.3d at 590. The motion to dismiss (doc. 10) the petition should be granted.

## RECOMMENDATION

It is recommended that the motion to dismiss the petition for a writ of habeas corpus be GRANTED.


Dated:   Oct. 13, 2010                 /s/ Kenneth S. McHargh
                                       Kenneth S. McHargh
                                       United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).