IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Alfred Cleveland, | Case No. 1:10 CV 148 |
| Petitioner, | MEMORANDUM OPINION<br>AND ORDER DENYING PETITION |
| -vs- | |
| | JUDGE JACK ZOUHARY |
| Maggie Bradshaw, *Warden*, | |
| Respondent. | |

## INTRODUCTION

This habeas action has a lengthy history.  At the center of this case is the sad but all-too-common thread of drug addiction and drug-trafficking violence.  In 1996, a jury convicted Petitioner Alfred Cleveland of aggravated murder for the 1991 slaying of Marsha Blakely.  Three other individuals also were convicted of Blakely's murder -- Benson Davis, Lenworth Edwards, and John Edwards.  It is undisputed that Cleveland and these others convicted of Blakely's murder were trafficking drugs from Jamaica-Queens, New York to Lorain, Ohio during the summer of 1991.  It is also undisputed that Blakely was addicted to crack-cocaine.  The disputed allegations are that Cleveland and the Queens-based drug traffickers killed Blakely over money she owed them for drugs.

This Court originally dismissed Cleveland's Petition as time-barred by the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year statute of limitations (Doc. 20).  The Sixth Circuit reversed, finding Cleveland presented a credible claim of actual innocence, entitling him to equitable

tolling, and remanded to this Court for consideration of the Petition's merits.  *Cleveland v. Bradshaw*,

693 F.3d 626 (6th Cir. 2012).

On remand, Cleveland filed an Amended Petition (Doc. 34), adding additional claims for

relief.  Respondent Warden Maggie Bradshaw filed a Return of Writ (Docs. 35, 37), and Cleveland

filed a Traverse (Doc. 39).  This Court held a full-day evidentiary hearing on December 17, 2013[1],

during which both Cleveland and Respondent presented evidence (*see* 12/17/13 Minute Entry), and

this Court reviewed videotape deposition testimony submitted by Cleveland (*see* Doc. 76).  This Court

held final oral argument on April 7, 2014 (*see* 4/7/14 Minute Entry).  Also submitted is an Amicus

Curiae Brief in support of the Petition (Doc. 99), Cleveland's Final Argument Presentation (Doc.

100), and Cleveland's Bench Brief on Actual Innocence Claim (Doc. 101).

## BACKGROUND

### The Sixth Circuit

The following facts are taken from the Sixth Circuit opinion summarizing the state court

record:

> Marsha Blakely's body was discovered in an alley in Lorain during the
> summer of 1991.  She had fractured ribs and a broken neck.  Her throat had also been
> cut, and she had torture-type wounds on the side of her neck and head.  A witness to
> the murder eventually came forward, describing in detail the events of that fateful
> night.  The witness' statement implicated the group of men responsible, one of whom
> was Defendant.  Defendant was indicted for the aggravated murder of Ms. Blakely.
> He was arrested and arraigned in May of 1995.
>
> Trial began as scheduled.  It lasted six days, and included the foregoing
> witness' testimony explaining Defendant's participation in the death of Ms. Blakely.

---

[1]

Citations to the December 17 hearing transcript are designated as "TR." Cleveland and the State also
submitted hearing exhibits designated as "EX" 1–124 (*see* Exhibit Lists at Docs. 49, 55, 69, 72, 75,
77, 78, 95).  "APP" refers to the state court Appendix (Docs. 35-1, 35-2, 35-3, and 35-4).

After two days of deliberations, Defendant was found guilty as charged in the indictment.

Although Cleveland was charged with Blakely's murder only, another person, Floyd Epps, was murdered on the same night as Blakely and the police believed the murders were related. Epps's body was discovered at approximately 1:25 a.m. on August 8, 1991, and Blakely's body was discovered almost eight hours later at approximately 9:18 a.m. After the police investigation into these murders stalled, the Lorain County prosecutor offered a $2,000 reward. In response, William Avery, Sr. ("Sr."), a longtime police informant, contacted the police on September 10, 1991, with information about the murders. The police informed Sr. that the reward would be given only to someone with firsthand information. The following day, Sr. brought his son, William Avery, Jr., to the police and informed them that Avery had firsthand information to provide. Avery then implicated four persons in Blakely's murder—Lenworth Edwards, Benson Davis, John Edwards, and Cleveland. According to Avery, all four men were drug dealers from New York who came to Lorain, Ohio to sell crack-cocaine. Avery informed the police that he owed Cleveland money for drugs and that he had offered to assault someone to pay off the debt. Cleveland then took Avery to Epps's apartment and told Avery to assault Blakely, who was there at the time. However, Avery refused to assault Blakely because he knew her personally. Avery and Cleveland then watched while Edwards, Davis, and John Edwards assaulted Blakely for twenty minutes. Avery told the police that although he was present only at the assault, Cleveland came to his apartment an hour or two after the assault and told him, "We took care of the junkie, we knocked her off."

As a result of providing the above information, Avery received the $2,000 reward, an additional $2,000–$3,000 for his deposition testimony, and a relocation stipend.

The State tried Edwards first in 1991. At the behest of Sr., Avery demanded $10,000 more from the prosecutor for his trial testimony. When the prosecutor refused, Avery refused to testify at the trial. The court then put Avery in jail for contempt. At some point, Avery returned to court and testified under oath that he had lied about witnessing any acts involving Blakely. This resulted in a mistrial and Avery's imprisonment for perjury. While in jail, Avery decided to withdraw his recantation and again state that Cleveland, Edwards, Davis, and John Edwards were involved in Blakely's murder. At this time, Avery also informed the prosecutor for the first time that instead of going home after Blakely's assault, as he previously stated he did, he went with all four defendants and Blakely to the back of a shopping plaza where he saw a fifth male, known as "Justice," repeatedly beat Blakely with a shiny object.

3

During Edwards's retrial, Avery testified that he had lied about not being a witness during Edwards's first trial and that he had seen part of the second assault that eventually caused Blakely's death before he ran away. Avery repeated this version of events at the trials of Davis, Cleveland, and John Edwards, who was tried last. During Cleveland's trial, Avery explained that he had recanted his testimony in Edwards's first trial because he had been threatened by Edwards while in the county jail for his contempt charge. Avery also admitted on cross-examination that he had lied to the police on at least two occasions regarding what he witnessed that night.

Cleveland maintained his innocence throughout the trial and presented several witnesses who testified that he was in New York throughout the week of August 5–12, 1991. Based on evidence that Cleveland had met with his probation officer on the morning of August 7, 1991, the government conceded Cleveland's presence in New York at that time. Cleveland also presented evidence that he was in New York at approximately 10 a.m. on August 8, 1991, the morning Blakely's body was discovered. Nonetheless, the jury convicted Cleveland of aggravated murder on January 31, 1996.

The court sentenced Cleveland to life imprisonment with the possibility of parole after twenty years. Cleveland filed a timely appeal to the Ohio Court of Appeals on February 27, 1996. The Ohio Court of Appeals affirmed Cleveland's conviction on March 6, 1997. Cleveland filed a pro se notice of appeal and a motion for leave to file a delayed appeal to the Ohio Supreme Court on May 9, 1997, which the Ohio Supreme Court denied on July 2, 1997. On July 15, 1997, Cleveland filed a delayed application to re-open his appeal in the Ohio Court of Appeals to assert a claim of ineffective assistance of appellate counsel. The Ohio Court of Appeals dismissed Cleveland's application as untimely on July 29, 1997. Cleveland then filed a timely appeal to the Ohio Supreme Court on September 8, 1997 and, on November 12, 1997, that court dismissed his appeal as not involving any substantial constitutional question.

In the interim, on December 3, 1996, Cleveland filed a motion for a new trial in state court and a motion for leave to file a delayed motion for a new trial based on an affidavit from Jeremiah Abdullah Charlton. Abdullah attested in his affidavit that Cleveland was not involved in the murder and that Abdullah had tried to inform law enforcement and the prosecutor of this fact prior to trial. Abdullah further declared that Avery stated that he had fabricated the story about the four defendants' involvement in Blakely's murder. The court held a hearing on June 9, 1997, but denied the motion for a new trial because Cleveland produced no evidence at the hearing in support of his motion. Cleveland filed a timely appeal to the Ohio Court of Appeals on July 8, 1997, and that court affirmed the trial court's decision on April 8, 1998.

4

Between 1998 and 2006, Cleveland searched for Avery.  Cleveland's family hired a private investigator, Martin Yant, who located Avery in 1998.  However, Avery fled when Yant and Cleveland's wife attempted to meet with him to discuss the case. Students from the Innocence Project at Northwestern University also hired a private investigator who unsuccessfully searched for Avery for two years.

On November 24, 2004, Avery, unbeknownst to Cleveland, contacted FBI Agent William Beachum and informed him that he had lied during the trials of Cleveland and the other defendants.  Avery also informed Agent Beachum that Avery's father had committed the murders and that Sr. had pressured Avery to come forward so that Sr. could collect the reward money and cover up his guilt. This information was not communicated to Cleveland.

Cleveland's wife learned that Avery was in Detroit in late 2005 and traveled there to find him but was unsuccessful.  Cleveland's father then went to Detroit in January 2006 and informed Avery's mother that he wanted to speak with Avery.  Avery called Cleveland's father a week later and said that he would meet with Cleveland's attorney, Bruce Ellison, and private investigator, Paul Ciolino.  Avery then spoke with Ellison telephonically and admitted that he had lied during Cleveland's trial. Ellison informed Cleveland of this fact during a jailhouse conversation on February 5, 2006.

On February 9, 2006, Avery met with Ellison and Ciolino and signed an affidavit recanting his trial testimony.  In this affidavit, Avery also averred that during Edwards's trial he informed the prosecutor that his earlier statements about witnessing the murder were false but the prosecutor told him, "[I]f these dudes don't go down for this, that [Avery] would."  Avery met with Ellison and Ciolino again on April 4, 2006, this time with a court reporter present, and provided a sworn statement of recantation with additional details.  Avery claimed that he was now recanting because he had quit using drugs, had a full-time job, and was trying "to get [his] life straight with God."  Avery also claimed that after informing his mother about his 2004 conversation with the FBI, she told him that he needed to come forward and tell the truth.  However, at no point during Avery's conversations with Cleveland's counsel did Avery repeat the detail he had stated previously that his father had actually committed the murders.

*Cleveland v. Bradshaw*, 693 F.3d 626, 628–30 (6th Cir. 2012).

**Evidence of Actual Innocence Cited by the Sixth Circuit**

The Sixth Circuit found four pieces of new evidence to be sufficiently reliable to warrant equitable tolling for actual innocence.

5

(1)     Avery Jr. Recantation

The Sixth Circuit pointed to the "substantial differences between Avery's 1991 [pre-trial] recantation and his 2006 recanting affidavit." *Cleveland*, 693 F.3d at 636.  It found the 2006 affidavit to be internally consistent and reliable -- noting the only discrepancy in the affidavit "pertains to whether Detective Taliano showed Avery crime scene photographs during Avery's initial interview or at some later point in the investigation." *Id.* at 640.

The Sixth Circuit also found that "the circumstances surrounding Avery's recantation render it more credible than his trial testimony or pre-trial statements." *Id.*  The court cited the fact that Avery received reward and relocation money from law enforcement for his pretrial and trial testimony but received no compensation for his later recantation statements. *Id.*  The court also cited Avery's 2004 unsolicited statement to the FBI. *Id.*  Finally, the court pointed out that Avery did not recant his latest recantation as he did with his 1991 recantation.  Rather, this time around, Avery invoked his Fifth Amendment right to remain silent in a 2008 state court post-conviction hearing.  In light of these circumstances, the Sixth Circuit concluded that "the fact that Avery had no motive to recant his testimony but instead sought to do so on his own free will, and has not subsequently withdrawn that testimony, lends it credibility." *Id.* (citing *House v. Bell*, 547 U.S. 518, 552 (2006)).

(2)     Dehus Affidavit Re: DNA

Cleveland offered the October 2005 affidavit of forensic scientist Larry Dehus in which Dehus testifies that Blakely's blood was found on a piece of rubber found at the Epps murder scene.  This evidence is potentially significant because it impacts the time frame in which Blakely could have been murdered.  Because Epps was discovered by police several hours *before* Blakely, Cleveland claims this forensic evidence shows that Blakely was murdered before Epps, shortening Blakely's time of

death from sometime between 12 midnight and 3:00 a.m., as the medical examiner testified at Cleveland's trial, to sometime between 12 midnight and 1:25 a.m.  The State did not challenge the reliability of Dehus' affidavit in connection with Cleveland's equitable tolling, and the Sixth Circuit concluded it was sufficiently reliable.  *Cleveland*, 693 F.3d at 638.

      (3)     Donaphin Affidavit Re: Cleveland's Alibi

Cleveland also offered the July 2006 affidavit of childhood friend David Donaphin in support of his alibi.  Donaphin was not called to testify at Cleveland's trial.  In the affidavit, Donaphin asserts that on the evening of August 7, 1991, he celebrated his twenty-third birthday with friends in Hollis Hills, New York.  The affidavit further states when his party ended, he drove a friend home and, in the process, ran into Cleveland in St. Albans, New York, sometime between 10:00 p.m. and 12 midnight.  Donaphin states he spent some 15–20 minutes with Cleveland that evening.

The Sixth Circuit determined Donaphin's affidavit was reliable.  The court found that because August 7, 1991 was Donaphin's birthday, it was "more likely that Donaphin would remember the events that transpired on that date than if it had been another date with no particular significance." *Id.* at 641.  The court also found that because "there is no evidence of any close ties" between Donaphin and Cleveland, Donaphin's affidavit "does not have the same risk of bias as an affidavit made by close friends or relations of Cleveland." *Id.*

      (4)     Flight Records from New York City to Cleveland, Ohio

Finally, the Sixth Circuit cited evidence of flight records for August 7, 1991 submitted by Cleveland.  The records show that the last flight from New York to Cleveland on August 7 departed at 10:40 p.m.  Given Donaphin's affidavit about meeting Cleveland between 10:00 p.m. and 12 midnight, Cleveland contends it would have been impossible for him to be at the airport in time for

7

that flight.  The State did not challenge the reliability of the flight records, and the Sixth Circuit

concluded they were sufficiently reliable.  *Cleveland*, 693 F.3d at 638.

### Cleveland's Amended Petition

After the remand to this Court, Cleveland filed an Amended Petition (Doc. 34), raising the

following grounds for relief:

- First Ground: Cleveland is actually innocent of Blakely's murder, and therefore his conviction violates the U.S. Constitution.

- Second Ground: The State violated Cleveland's due process rights by presenting testimony from William Avery and Delphina Guice that the State knew or should have known was false.

- Third Ground: The State violated Cleveland's due process rights when it failed to disclose evidence favorable to the defense.

- Fourth Ground: The State violated Cleveland's substantive and procedural due process rights to a fair trial because the prosecutor committed misconduct.

- Fifth Ground: Cleveland's trial counsel was constitutionally defective.

- Sixth Ground: Cleveland's appellate counsel was constitutionally defective on direct appeal.

### Summary of Evidence Presented During the Evidentiary Hearing

Paul Ciolino, a private investigator working on behalf of Cleveland, testified about his

encounters with Avery in 2006 and the circumstances under which Avery provided the February 2006

affidavit and an April 2006 oral statement.  He also testified about his investigation into flight records

from New York City to Cleveland, Ohio for August 7, 1991, and that, according to airline records (EX

24), the last flight to Cleveland departed from New York at 10:33 p.m.  The State pointed out that one

of its theories at trial was that Cleveland had driven, not flown (TR 67), and trial evidence showed

that Cleveland could drive from New York to Lorain in six hours.

8

Benson Davis, a convicted co-defendant of Cleveland, testified about his involvement in selling and transporting drugs to the Lorain area (TR 77).  The bulk of his testimony concerned a telephone bill (EX 10) for a phone number assigned to his brother, Ian Davis, which he asserted showed Cleveland was in New York late into the evening and early morning of August 7–8.  The phone bill is a single page that does not identify the individual associated with the phone number or otherwise reflect a connection between Davis and the bill.  The single page contained handwritten markings -- lines and dashes -- not written by Davis or Cleveland -- instead, allegedly the markings of Ian Davis, Benson's brother.  The thrust of Davis' testimony was that a call placed from the phone bill's number to a Cleveland, Ohio number at 12:18 a.m. on August 8 could only have been placed by Cleveland, proving he was in New York at the time Blakely was murdered.  Davis testified that the first time he was aware of the phone bill's existence was in December 1992 when Ian brought it to his attention; however, Cleveland was not aware of the phone bill until years later in 2011 when he and Davis were incarcerated at the same prison.

Ian Davis testified (via video deposition) that in 1991 he lived in the basement of his family home in New York where he had his own phone line; was responsible for paying his phone bill and kept copies of paid phone bills; and occasionally his brother Benson and Cleveland used his phone line and would pay him for calls they made.  Each month, Ian would go through his phone bill and mark who made each call and how much was owed for the call (Doc. 76-8, pp. 6–7).  Ian claims he did not place a call on August 8, 1991 at 12:18 a.m. to Cleveland, Ohio, and that on the phone bill he assigned the call to Cleveland because "Cleveland was the only one I knew that knew someone in Cleveland[, Ohio]" (p. 11).  He admitted he did not personally witness Cleveland place the call

9

(p. 15), but did remember seeing Cleveland at his home on August 7–8 because Cleveland had brought his BMW car to the Davis house (pp. 11–12).

Cleveland testified, denying murdering or even knowing Blakely (TR 123).  He was trafficking drugs between New York and Cleveland, Ohio during the summer of 1991, at which time he was 21 years old (TR 129).  He primarily lived in New York with one of his girlfriends, Tanya Hawkins.  They lived in a townhouse, and a teenaged girl named Ayasha Teague and her family lived above Cleveland and Hawkins (TR 130–31).  During that summer, Cleveland drove a used black BMW purchased for $30,000 from a local auto body repairman (TR 132–34).

Cleveland described how he first encountered Avery that summer.  Cleveland had traveled to Lorain to visit John Edwards, and together they sold drugs on the street.  Edwards was arrested, after which Cleveland ended up meeting an unknown man who drove Cleveland around Lorain and eventually dropped him off at Avery's house (TR 136–37).  That was the first time Cleveland met Avery who later owed Cleveland $1,300 for drugs (TR 137).

According to Cleveland, on August 7, 1991, he was in New York.  He had a meeting there with his probation officer sometime that afternoon (TR 146).  In the evening hours, he went to the Davis family home (next door to his childhood home) and by around 10:30 or 11:00 p.m., Cleveland and a "bunch of guys" were hanging out on the street, listening to music being played in Cleveland's BMW, and "just kicking it" (TR 141–42, 147).  He recalled using Ian Davis' phone in New York during the early morning hours of August 8, 1991 to call another girlfriend he knew in Cleveland, Ohio (TR 142–43). After he placed that phone call, he returned to his BMW to find an acquaintance named David Donaphin sitting in his BMW (TR 149).  Cleveland explained he did not testify at trial

10

about seeing Donaphin because he had forgotten about some of the details of that particular night (TR 150–51).

On cross examination, the State pointed out the inconsistencies between Cleveland's 2013 testimony and his 1996 trial testimony. For instance, at trial, Cleveland denied he sold drugs and never mentioned a black BMW; he only testified about owning a Jetta. He also never mentioned his Ohio girlfriend or that he ran into Donaphin and others the evening of August 7. The State also pointed out that Cleveland has no evidence he ever purchased or owned the BMW.

David Donaphin testified (via video deposition) that he and Cleveland grew up together in the same New York neighborhood (Doc. 76-5, p. 2). Donaphin recalls some of the events of Wednesday, August 7 because it was his twenty-third birthday, and his girlfriend threw him a birthday party that started in the afternoon and lasted five or six hours (p. 6). After the party, Donaphin drove a friend named Mark Callahan to his home on Hillburn Avenue. While traveling to Callahan's home, Donaphin drove by Mangin Avenue where he encountered many individuals in front of the Davis home (p. 7). He recalled seeing a black BMW parked in front of the house, and Donaphin stopped to chat with some of the individuals outside the Davis home. A few minutes later, Cleveland emerged from the Davis home, and Donaphin asked Cleveland if he could take the BMW for a drive. Cleveland said "no," to which Donaphin protested that it was his birthday, and Cleveland instead gave him some money (pp. 7–8). During the encounter, Cleveland asked Donaphin to transport drugs to Ohio, which Donaphin and Benson Davis later did (pp. 11–12). Donaphin estimates his conversation with Cleveland lasted about 30–45 minutes and occurred around 11:30 p.m. or midnight (p. 8). Donaphin could not name any other individuals who were present at the Davis home that evening (p. 17).

11

Ayasha Teague testified (via video deposition) that in 1991, when she was 16 years old, she kept a daily record of events (EX 5 is a copy of her entire 1991 calendar). The calendar listed both upcoming events as well as past events that had already taken place. A "past events" entry "would be made either that day or the next day" (Doc. 76-2, pp. 6–7). The notations cover birthdays and also rather mundane details about Teague's daily life.

In 1991, Teague and her family lived in the apartment above Cleveland and Hawkins. Teague's calendar includes some details of Cleveland's comings and goings. For example, the date of May 19 includes the notation "Al leaves" and the date of July 6 includes the notation "Greek fest. Hair done. Al came home." On August 7, the calendar notes: "Al playing around. Washed BMW. He wet me and my clothes. Irv came over." Teague remembers that on August 7 Cleveland was washing his BMW and began spraying her with the hose, and then a friend of Cleveland's named Irv stopped by (p. 10). Teague does not recall what time this occurred (TR 16). August 8 does not contain a notation referencing Cleveland, but does read: "Ruby's B'Day. Kyle is home early. Jamaica Ave. Tonya. Gyro." The next day, August 9, her calendar shows "Al get screen T.V. !!" She remembers that on August 9, Cleveland had a big screen television delivered to his home. Teague testified at the 1996 trial, but was not permitted to testify about the calendar because Cleveland's counsel had failed to timely disclose it as an exhibit.

Former Lorain Police Officer Leslie George testified about responding to the Epps murder scene in the early morning of August 8. He found a rubber sleeve with blood on it near Epps' body, a photo of which was admitted as EX 70. Elizabeth Benzinger, an expert with the Ohio Bureau of Criminal Investigation ("BCI"), tested the sleeve for DNA. She refuted the allegations in the Larry Dehus affidavit previously submitted by Cleveland. The BCI reports of this testing are EXS 99 and

12

105.  According to Benzinger, DNA testing revealed the blood on the sleeve did not match Blakely and was from a male, not a female (TR 195).  Benzinger surmised the blood was likely Epps' but was not certain because law enforcement did not have a DNA standard for Epps for comparison (TR 198). Stacy Violi, also from BCI, testified generally about DNA and the testing reflected in EXS 99 and 105.

Former Lorain Police Detectives Richard Resendez and Geno Taliano were the primary investigators of the Blakely and Epps murders.  Resendez testified that investigators first visited Epps' apartment on August 9, and then again on September 18 at which time police took photographs of the apartment (TR 211).  He and Taliano held several interviews with Avery.  He first spoke with Avery about the Blakely murder on September 11 when police had not yet photographed the interior of the Epps apartment (TR 213).  Resendez and Taliano also interviewed Delphina Guice who had approached police on August 13 with information about the murders.  Guice was concerned that a potential suspect, Lenworth Edwards, had used her vehicle the evening of the murder and stayed at her house that same night (TR 218–19).  Guice later gave police clothing Edwards wore that night and left at her residence, including a jean jacket with blood stains (TR 219).

Former Assistant Lorain County Prosecutor Jonathan Rosenbaum testified about his involvement in the prosecution of Cleveland and his three co-defendants for Blakely's murder. Rosenbaum prosecuted each defendant in separate trials, and had continuing contact with Avery during those trials.

STANDARD OF REVIEW

**Statute of Limitations and Procedural Default**

The State once again argues that Cleveland's Petition is barred by AEDPA's one-year statute of limitations.  This argument ignores the Sixth Circuit's prior ruling applying equitable tolling, and this Court is bound by the law of the case.  *See Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006) ("[U]pon remand the trial court is bound to proceed in accordance with the mandate and law of the case as established by the appellate court.") (internal quotation marks and citation omitted). Therefore, the State's untimeliness argument is rejected.

Notably, the Ohio courts never squarely addressed the grounds now raised by Cleveland in his Amended Petition.  This is so, in part, because the Ohio courts found Cleveland's 2006 post-conviction relief petition untimely and equitable tolling unavailable.  *See State v. Cleveland*, 2009-Ohio-397 (Ohio Ct. App. 2009).  Cleveland did raise on direct appeal the claims now presented in his Amended Petition.  *See State v. Cleveland*, 1997 WL 104653 (Ohio Ct. App. 1997).

The State further argues that Cleveland's claims are procedurally barred because he failed to timely present them to the state courts.  However, this argument again ignores that the Sixth Circuit's application of actual innocence to Cleveland's Petition provides a "gateway" for Cleveland "to have his otherwise barred constitutional claim[s] considered on the merits." *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).  The Circuit's actual innocence finding enables Cleveland to overcome not only the one-year AEDPA statute of limitations bar, but also the state procedural bar (premised on Ohio's post-conviction petition statute of limitations).  *See id.*; *accord Reeves v. Fortner*, 490 F. App'x 766, 770 (6th Cir. 2012) ("Because we conclude that

14

Reeves has not met the standard required to excuse a procedural default by demonstrating evidence of actual innocence, we do not address Reeves's claim of ineffective assistance of counsel.").

### Fact Record before this Court

Under AEDPA, a state court's factual findings that may bear on petitioner's claims are presumed correct on federal habeas review, and may be rebutted only with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1988). This Court held an evidentiary hearing and admitted additional evidence on Cleveland's claims under 28 U.S.C. § 2254(e)(2) and *Townsend v. Sain*, 372 U.S. 293, 312–13 (1963).

### De Novo Review of Legal Claims

Because the Ohio courts did not reach the merits of Cleveland's claims, federal habeas review by this Court is not subject to the deferential standard under AEDPA that applies to "any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Instead, the legal claims are reviewed de novo. *Cone v. Bell*, 556 U.S. 449, 472 (2009) (de novo review appropriate where state courts did not reach merits of petitioner's *Brady* claim).

ANALYSIS

### First Ground: Actual Innocence

The Supreme Court has never recognized a stand-alone habeas claim of actual innocence. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). The Supreme Court recently acknowledged the absence of precedent for such a claim -- "Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming,

15

arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009).  Citing Supreme Court precedent (or more aptly, the lack therefore), courts have held that a freestanding claim of actual innocence in a non-capital case based on newly discovered evidence is not a proper ground for habeas relief.  *See Cunningham v. Dist. Attorney's Office for Escambia County*, 592 F.3d 1237, 1272 (11th Cir. 2010) ("[T]his Court's own precedent does not allow habeas relief on a freestanding innocence claim in non-capital cases."); *Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir. 1998) ("[T]he claim of innocence grounded in [multiple personality disorder] itself is not a basis for federal habeas corpus no matter how convincing the evidence.").

This Court is not in a position to create a new constitutional claim and define the "high standard" necessary for such a claim where the Supreme Court has expressly declined to do so.  Thus, as the law currently stands, actual innocence claims only operate to excuse procedural default so that a petitioner may bring an independent constitutional challenge.  *Herrera*, 506 U.S. at 400, 404.  To the extent Cleveland's first ground alleges a free-standing claim of actual innocence, his claim is not cognizable.  Any such claim must be tied to a constitutional injury.

### Second Ground: *Napue* False Testimony Violation

Cleveland claims the State knew Avery and Guice's trial testimony were false when prosecutors offered their testimony during trial.

In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court held that a defendant's due process rights are violated when a state knowingly uses false evidence, including false testimony, to obtain a conviction.  The knowing use of false or perjured testimony constitutes a denial of due

16

process if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989).  In order to prevail on a false-testimony claim, a petitioner must show "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false."  *Id.* (citing *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986)).

### *Avery's Statements*

This Court acknowledges Avery's testimony was "material" to the State's prosecution of Cleveland.  The first and third elements are inherently intertwined and call for a closer analysis of Avery's statements and the circumstances under which he gave them.

September 11, 1991 Recorded Statement. The audio recording of this interview is EX  2 and the transcript is EX 15.  Avery came forward after a $2,000 reward was publicized for information about the murders.  Avery's first recorded conversation with police took place on September 11, 1991.  The day prior, Avery's father, Avery Senior ("Senior"), went to the Lorain police and told them he had a witness to Blakely's murder.  The next day, Senior brought his son to the police station where Avery told officers he would provide information he had in exchange for the $2,000 advertised reward and protection from the murderers.  Avery proceeded to give officers a summary of what he professed to know about the crime.

Avery told detectives he owed about $3,000 to a New York drug trafficker he knew as "Al Monday" (Cleveland's pseudonym) and that he was to satisfy this debt by assaulting an individual who also owed Cleveland money.  Avery told detectives that Cleveland approached him on August 7 about assaulting someone and Cleveland took him to Floyd Epps' apartment, where a second car with three males associated with New York drug trafficking also arrived (later identified as Benson

17

Davis, Lenworth Edwards, and John Edwards).  Avery claimed that he, Cleveland, and the men from the second car entered Epps' apartment where they encountered Blakely with another male New York drug trafficker.

Avery told detectives that at this point Cleveland told him to assault Blakely in order to get information from her about missing drugs and money.  Avery was unwilling to do so because he had grown up with Blakely.  After he refused to assault Blakely, Cleveland directed the other men to assault her, which they did.  Avery relayed that Blakely struck Lenworth Edwards in the face during the assault, causing Edwards to cover his face and retreat from the attack.  (Police had recovered from Guice a jacket Edwards was wearing that evening with his own blood on it.).  Avery told police that during the melee, a kitchen table in the apartment was turned over.  A subsequent police investigation of Epps' apartment noted that a kitchen table leg was broken.

During this interview, Avery told detectives that Blakely was rendered unconscious during the attack, at which time Benson Davis dragged her out of the apartment and placed her in the backseat of the car Davis, Lenworth Edwards, and John Edwards had arrived in.  Avery got back into the car with Cleveland, and Cleveland proceeded to return Avery to his home.  Avery did not know what happened to Blakely after she was put in the other car with the three men.  He told detectives he did not witness her murder.

September 20, 1991 Interview.  The audio recording of this interview is EX 3, and the transcript is EX 16.  In an effort to confirm the information Avery provided to police on September 11, police gave Avery a polygraph exam.  The exam indicated Avery had additional information about the murder and had not been completely forthcoming.  After police advised Avery of the polygraph results, he gave a new recorded statement to police, adding details to his initial statement.

Avery now told police that Cleveland left after dropping Avery off at his home but later returned on foot to Avery's home after about one or two hours.  Upon his return, Avery reported that Cleveland stated "We took care of that junkie . . . .  We knocked her off."  Avery was afraid to relay this detail during the initial interview because he was fearful of retaliation from the perpetrators.

September 25, 1991 Grand Jury Testimony.  Avery testified before the Lorain County Grand Jury.  His testimony comported with the statements he gave police on September 11 and 20.

September 26, 1991 Deposition.  The prosecutor deposed Avery with defendant Lenworth Edwards and his defense counsel present.  The transcript is EX 18.  At that time, Edwards had been charged and arrested for the assault and murder of Blakely.  The deposition was taken to preserve Avery's testimony because the prosecution feared that something could happen to Avery prior to trial.  Avery testified to the same facts he reported to police on September 11 and 20.

Following Avery's deposition testimony, the Lorain County Prosecutor's Office provided him with $1,000 for relocation expenses and $2,000 in reward money.  Avery relocated to Detroit but returned to Lorain after a short time.

December 1991 Contempt of Court and Recantation.  After Lenworth Edwards' trial commenced, Avery told Detective Taliano that he would not testify at the trial unless he was given "immunity" and another $10,000 (EX 9 at 131).  The trial court brought Avery to the witness stand outside the presence of the jury at which time Avery asserted his Fifth Amendment right and refused to testify (*id.* at 134–35).  The prosecutor and the court informed Avery he was not under the threat of indictment for any crime, so he could not assert the Fifth Amendment as a basis not to testify.  Avery continued to refuse to testify unless he was paid additional money.  The judge jailed Avery for contempt of court.

A couple days later, as Avery sat in the Lorain County Jail for contempt of court (the same jail where Lenworth Edwards was being held), Avery contacted an FBI agent and told the agent Edwards had threatened him and his family -- Edwards made a motion with his finger across his own neck to simulate a throat being sliced; Edwards later formed his hand in the shape of a handgun and pointed at Avery; a corrections officer approached Avery and told him to "save himself" and not testify against Edwards, admonishing Avery that the perpetrators of Blakely's murder knew where Avery's father and girlfriend lived.  After these threats, Avery returned to the trial court and recanted, testifying that he had previously lied to police and in his pretrial deposition about the events of August 7–8.  He told the trial court he lied in order to obtain the reward and relocation money.  The judge declared a mistrial.

January 1992 Interview.  Avery, incarcerated for perjury in connection with the Lenworth Edwards case, told officers he had additional information about Blakely's murder, beyond what he had already provided.  Detective Resendez conducted an interview with Avery.  The audio recording of this interview is EX 1 and the transcript is EX 14.

His story about the events of August 7–8 largely remained the same.  He and Cleveland arrived at Epps' apartment where they encountered John Edwards, Lenworth Edwards, and Benson Davis.  Blakely was in the apartment with an unknown New York male known as "Supreme."  Avery told police the fight began in the bedroom area of the apartment, moving to the kitchen area where the table was knocked over.  Avery and Cleveland were standing in the kitchen area, and Avery again recounted how Lenworth Edwards was hit in the face.

At this point, Avery's story changed from his prior version.  He now claimed that he was not taken home by Cleveland after Blakely was dragged from the apartment.  Instead, they all drove

20

directly to the Westgate Plaza (the commercial plaza near the alley where Blakely's body was discovered).  Upon arriving, Avery told police that he and Cleveland drove behind the plaza where the still-unconscious Blakely was taken out of the second car and placed on the ground.  Avery now relayed that a new unknown black male (known only as "Justice"), who was already behind the shopping plaza in another vehicle, walked over to Blakely's body and began making downward thrusting motions at her body with a shiny object that Avery could not identify.  Avery stated that at this point he got scared and ran home and spent the remainder of the night with his girlfriend, Patricia Gaddy.  The next morning Gaddy informed him that Blakely's body had been found behind the Westgate Plaza.

After hearing this, Avery left his house and went to the home of his other girlfriend, Charlotte Watkins.  After three or four days, Avery told Watkins about witnessing Blakely's assault and murder.  Avery and Watkins then went to his father's house and told Senior what happened.

In this interview with Detective Resendez, Avery admitted he had lied when he previously testified Cleveland had made a statement to him about how he "knocked that junkie off," and did so because he did not want to place himself at the scene of the murder, so he made up the story about seeing Cleveland again.

January 1996 Trial Testimony.  Avery testified at Cleveland's trial (*see* APP 1877).  Avery told the jury about his drug-dealing relationship with Cleveland who would give Avery crack cocaine to sell and Avery would pay Cleveland later.  Cleveland fronted Avery drugs in this fashion about four or five times (APP 1878).  As a result of this relationship, Avery ended up owing Cleveland about $3,000 or $4,000, and Avery offered to beat up individuals to reduce his debt.

21

Avery testified that on August 7, 1991, Cleveland came to Avery's house to collect his money. Avery gave Cleveland about $3,000 that day but still owed Cleveland more money. Avery recounted for the jury how he and Cleveland arrived at Epps' apartment, how "Supreme" was already there with Blakely while Lenworth Edwards, John Edwards, and Benson Davis arrived separately by car, and how he refused Cleveland's request to beat up Blakely. He testified how Blakely hit Lenworth Edwards in the face, described how the fight left a mattress askew and kitchen table flipped over, and that Davis dragged the unconscious Blakely out of the apartment and into the backseat of a car. Avery explained they took Blakely to the alley behind the Westgate Plaza where an unknown black male was waiting, and that this male began "swinging" an object at Blakely. Avery claimed he ran home and told his girlfriend and Senior about the murder a few days later.

Avery admitted to the jury that he had not been completely truthful with police during initial interviews, detailing how he initially told police Cleveland had dropped him off at home, that he had not been to the Westgate Plaza, and that he had not witnessed Blakely's murder (APP 1893–94). He also told the jury that he lied to police when he told them Cleveland made the statement that "We killed that junkie bitch," explaining that he finally told police the truth after he was jailed for perjury charges in connection with Lenworth Edwards' trial (APP 1895).

He explained to the jury that he refused to testify at Lenworth Edwards' first trial because his father insisted Avery demand an additional $10,000 for his trial testimony (APP 1896). He then told the jury about how Lenworth Edwards had threatened him when Avery was sent to jail for contempt of court, causing him to recant his pretrial deposition testimony.

On cross examination, Cleveland's trial counsel, Mary Papcke, questioned Avery about his different versions of events, pointing out that Avery's September 1991 deposition was closer in time

22

to Blakely's murder than later statements (APP 1900–01).  Papcke questioned Avery about the details of the evening, and highlighted that Avery could not recall the color and make of the car Cleveland was driving or what the participants in the murder were wearing (other than that they had on "dark colors") (APP 1905, 1911–13).  She also elicited testimony that Avery did not know who among the group first attacked Blakely (APP 1916).  Papcke questioned Avery's vantage point of the attack on Blakely (seated in a car with Cleveland) that took place in the alley and whether he could actually see what was happening (APP 1931–32).

Avery admitted he lied during the September 1991 deposition by leaving out the fact that he and Cleveland went with the group to the Westgate Plaza after the fight at Epps' apartment (APP 1937).  Avery also admitted that he collected somewhere between $4,000–5,000 in reward money, relocation money, and per diem compensation (APP 1938).  Avery once again acknowledged that he had previously recanted his testimony during Lenworth Edwards' first trial and that later he claimed he only recanted because he was threatened.  Papcke cross examined him on the fact that, despite this claimed fear, Avery returned to Lorain shortly after relocating to Detroit (APP 1939).  She also elicited testimony that Avery had been inconsistent in prior testimony as to whether or not he saw Lenworth Edwards' nose bleeding after Blakely hit him in the face (APP 1941–42).

2004–05 FBI Statements.  Avery approached FBI agents in November 2004 and met with Special Agent William Beachum and another agent from the Detroit office.  Avery told the agents he had lied about witnessing Blakely's murder and claimed his father had committed the crime (APP 595).  He told the agents his motive was to collect reward money and avoid paying Cleveland a $5,000 drug debt.  According to Agent Beachum's affidavit, at no time during the interview did Avery allege police had shown him photos of the crime scene during questioning from which he conjured

23

up a story of how the assault and murder occurred.  Avery also told the agents Senior was involved in another murder in the Detroit area a few years prior (APP 596).

Avery had no further contact with the FBI agents until July 2005 when Agent Beachum tracked down Avery in an effort to locate Senior.  Agent Beachum had no further conversations at that time with Avery about Blakely's murder.  Agent Beachum eventually located Senior who denied any involvement in Blakely's murder and offered to take a polygraph.  Senior told Beachum that his son Avery witnessed a murder in Lorain, and Blakely was murdered by "New Jersey" drug dealers because she took money and crack cocaine belonging to the dealers (APP 596).

February 2006 Affidavit.  Paul Ciolino, a private investigator working on behalf of Cleveland, testified about how Avery's 2006 affidavit (EX 12) came to pass.  Ciolino was first contacted by Cleveland's wife around 1999 (TR 25). After reviewing the case file, Ciolino attempted to locate Avery, which was difficult because Avery was transient, had no job, and was not receiving public assistance (TR 35).  Ciolino found Avery after seven years of searching.

In 2006, Avery's mother received a phone call from Cleveland's father, Leon (APP 285). Leon asked Avery's mother to have Avery get in touch with him, which Avery did.  Leon asked Avery to meet with Ciolino and Bruce Ellison, one of Cleveland's attorneys, which Avery agreed to do.  Ciolino located Avery in Detroit and spoke with him for over two hours, at the conclusion of which Avery signed an affidavit (APP 38).  Witnessing Avery's signature were Ciolino, Ellison, and a Detroit-area notary Ciolino found at a currency exchange near Ciolino's hotel (APP 37).  Ciolino and Ellison typed the affidavit at the hotel after speaking to Avery and took it to the currency exchange for Avery's signature.

24

In the affidavit, Avery stated that while he did know Cleveland as a drug dealer from New York with whom he did business, his trial testimony "was a lie," that he "never witnessed the murder of Marsha Blakely, was not with her or Al Cleveland the night she was murdered," and his testimony "was a story my father told me to tell" (APP 281).  Avery stated his father came to him after Blakely's murder and told him the New York drug dealers were going to kill Avery next because he owed Cleveland money.  While smoking crack, he and Senior decided Avery would lie and tell police he was a witness to Blakely's murder.  Senior proceeded to help make up a story for Avery to memorize (APP 282).

Avery stated that during the initial interview with police on September 11, the police showed him pictures of Epps' apartment and Avery "made up the story of what happened in the apartment based upon the pictures" (APP 283).  At some point, he wanted to tell police the truth -- that Cleveland and the others were not involved in Blakely's death -- but he was too afraid of Senior (APP 283):

> I told my Dad that this was wrong, that Al was my friend, that I had no reason to think he would hurt me.  My Dad then said I had to go to the police and continue to tell this story or he would kill me, my son, and Charlotte, if I told anyone about his plan.  I believed him.

With regard to his testimony at Lenworth Edwards' first trial, Avery now claimed that:  Senior demanded Avery ask for an additional $10,000; he told Assistant Prosecutor Rosenbaum that he was "lying for the money"; Rosenbaum got angry with him and told him that "if these dudes don't go down for this [Avery] would"; and he later testified at the trials because he feared Senior (APP 283–84).

April 2006 Oral Sworn Statement.  Two months after Ciolino procured the February 2006 affidavit, he sought out Avery for another recorded statement.  He again found Avery in the Detroit

area.  Ciolino rented a car and brought a court reporter with him.  The court reporter gave Avery an oath and took down a statement in the back of the car.  The questions and answers lasted approximately forty minutes (TR 41–42).  Avery again claimed he did not witness Blakely's murder (APP 290).  He also provided more detail about his upbringing with Senior.

     <u>January 2008 Post-conviction Hearing</u>.  On January 31, 2008, the state trial court held a hearing on Cleveland's state petition for post-conviction relief.  The transcript of that hearing is EX 11.  Avery was present in court and prepared to testify about the recantation outlined in the February 2006 affidavit and April 2006 statement.  Before Avery began his testimony, the trial judge admonished Avery about the penalty for perjury:

| | |
|---|---|
| THE COURT: | And you understand, you understand what you are facing with your testimony today?  Do you have any idea? |
| AVERY: | Nothing but the truth coming out. |
| | |
| THE COURT: | Okay.  Should I find that what you testify is the truth, do you understand that that means that what you stated in at least four other trials -- the mistrial, there is a question as to what you really testified to there, I guess -- but on four other occasions, at the very least, would be at the very least contradictory to what you are testifying to today, based on what I've seen in your deposition and affidavit. |
| | |
| | Do you know that that being the case, that there is the possibility that this Prosecutor's Office could charge you with perjury, a felony of the Third Degree? |
| | |
| | Do you realize that? |
| AVERY: | No. |
| | |
| THE COURT: | Do you know what the penalties for perjury are in this state? |
| AVERY: | No. |

     The court then afforded Avery the opportunity to consult with a court-appointed lawyer, after which Avery returned to the witness stand.  Before he testified, however, the prosecutor asked the trial

judge to read Avery his Miranda rights, which the trial judge did (APP 1219).  Avery then requested

another opportunity to consult with his lawyer, after which Avery's lawyer asked the prosecutor to

grant him immunity. The prosecutor refused.  Avery then declined to testify and asserted his Fifth

Amendment rights (APP 1226).  At the request of Cleveland's counsel, the trial court took a recess

to enable Avery to further consult with his lawyer.  When the hearing reconvened for the final time,

Avery again asserted his Fifth Amendment rights (APP 1232).

### Hearing Evidence Re: Avery

Detective Taliano rejected Avery's claim in his 2006 affidavit that "One time Taliano and

Resendez came to the house to meet with my Dad.  My Dad had a crack pipe in his hand at the time

and the house was full of people smoking crack," and the detectives did nothing about the overt

criminal activity (APP 282–83).  Detective Taliano testified that Senior was becoming "a thorn in our

side as far as investigation, actually an obstructionist," and "had I had the opportunity to arrest him

for having drug paraphernalia or a crack pipe in his hands, I would have taken that opportunity to

remove him from the situation" (TR 257).  He testified that, contrary to Avery's 2006 affidavit, police

investigators did not show Avery photographs of Epps' apartment before questioning him.  In fact,

Taliano testified that the apartment was not photographed until September 18, 1991, well after his

initial interview with Avery on September 11 (TR 257–58).  He also testified that contrary to Avery's

2006 oral statement, Avery and Senior did not come to the police "two or three days" after the murder

(APP 291).  Rather, the Averys first approached police more than a month after the murder(TR 258).

Following Avery's "come clean" interview in January 1992, after he had been jailed on a

perjury charge, Detective Taliano verified the latest version of events by interviewing Charlotte

Watkins, the girlfriend in whom Avery had confided about witnessing the murder.  Watkins verified

27

that Avery told her about Blakely's murder about four days after it occurred, and her version of what Avery told her corroborated what Avery had told Taliano (APP 1162).

Detective Taliano also testified that the polygraph of Avery's initial September 11, 1991 story confirmed he was being deceptive as to only one point: that he went home after the scuffle and did not witness Blakely's murder (TR 297–98).

Detective Resendez, in his experience, found Avery to be "always forthcoming" during their interviews and Avery "never had any problems conversing with us or answering any of our questions" (TR 242).

Assistant Prosecutor Rosenbaum also testified about his dealings with Avery at the evidentiary hearing.  Rosenbaum prosecuted Cleveland, Lenworth Edwards, Benson Davis, and John Edwards. He stated that the prosecution was prepared to offer Avery's September 26, 1991 deposition at Lenworth Edwards' original trial when Avery initially refused to testify unless he was paid an additional $10,000 (TR 315–16).  Rosenbaum explained that Avery "called the defense counsel for Mr. Edwards who brought him to court," and when Avery found out the prosecution was unwilling to talk to him or give him more money, "he decided to tell the Judge then that he recanted" (TR 316). Rosenbaum also denied the allegation in Avery's 2006 affidavit that Avery told Rosenbaum he was lying for money and that, in return, Rosenbaum threatened to prosecute Avery for the murder (TR 318).

***Guice's Statements***

Delphina[2] Guice was a girlfriend of Lenworth Edwards who loaned her car to Edwards the night of Blakely's murder and who brought Edwards' bloody jacket to police shortly after the murder. She initially contacted police on August 13, 1991.  She testified at both the Cleveland and Lenworth Edwards trials.

January 1996 Trial Testimony.  Guice testified she knew Cleveland through Lenworth Edwards, whom she dated for a few months during the summer of 1991 (APP 1834).  She gave Edwards' bloody jacket to police shortly after Blakely was discovered murdered (APP 1836). Edwards borrowed Guice's car the day before Blakely's body was discovered and he returned the car during the early morning hours of August 8, 1991 (APP 1837–38).

Cleveland's defense counsel crosse examined Guice with statements she made to police shortly after Blakely's murder.  Defense counsel pointed out that Guice had previously stated she did not know Cleveland or list him among individuals with whom she was familiar through Lenworth Edwards (APP 1843).  Guice also testified that the only reason she gave Edwards' jacket to police was because she saw blood on it and was told by police investigators she could be implicated in the murder if evidence came to light that she was involved (APP 1847).  She denied that police told her that they would take away her kids (APP 1847).  She testified that police impounded her car for an extended period of time in connection with the murder investigation (APP 1849).  She also testified that she was mistreated by the police (APP 1851):

_____

[2]

There is some dispute about the spelling of Guice's first name.  At trial, she testified the spelling was "Delphina" (APP 1832), but in her subsequent affidavit she spells her name "Delphenia" (APP 332–33).

29

Taking my car and making me think I was going to jail, like they killed her [Blakely] in my car and I was scared and that was why I ran over there and gave them all that stuff, because I didn't want to go to jail and I didn't want my kids to get taken away.

<u>October 2002 Affidavit</u>.  In 2002, Guice submitted a handwritten two-page affidavit as part of Cleveland's state post-conviction proceedings in which she asserts Cleveland was in New York at the time Blakely was murdered (APP 332).  She also contends her testimony at Cleveland's trial was coerced by the prosecution and that she had been "constantly threatened and harassed" by Detective Taliano (APP 332).

**Hearing Evidence Re: Guice**

Detective Resendez testified at the evidentiary hearing that he did not threaten or intimidate Guice to testify at Lenworth Edwards' trial and Detective Taliano denied he ever threatened or harassed Guice during interactions with her (TR 222, 252).  Assistant Prosecutor Rosenbaum also denied Guice's allegation that, at Lenworth Edwards' trial, he told her that she was "going to testify to what we tell you," as Guice alleged in her 2002 affidavit (TR 314, APP 333).

**Analysis**

"[A] recantation must be looked upon with the utmost suspicion."  *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003) (quoting *Sanders v. Sullivan* 863 F.2d 218, 225 (2d Cir. 1988)).  The question here is not whether Avery changed his story.  That is obvious.  Over time, he has done so on more than one occasion.  Indeed, even his original recantation was recanted.  The record reveals that Avery would do (or say) anything for money and drugs.  However, this Court finds the testimony by Avery at Cleveland's 1996 trial was not "actually false"  *See Lochmondy*, 890 F.2d at 822.  Cleveland has not established that Avery was not telling the truth at trial.  Avery has never recanted when it

mattered.  He has never recanted in a situation where he has been subject to cross examination.  He has never recanted in open court.

And, more to the point, physical evidence corroborated his trial testimony.  Police immediately made the connection between the murders of Epps and Blakely; they were aware that the two were acquaintances and spent a fair amount of time together.  On August 8, police secured Epps' residence, changing the locks (TR 293).  Shortly after the murders, detectives discovered that the car involved may have belonged to Guice.  They also discovered Guice was associating with a group from Jamaica-Queens, New York who were involved in drug trafficking.  Within a week of the murders, Guice produced the jacket with Lenworth Edwards' blood on it and told police she had loaned her vehicle to Edwards during the time of the murders.  Guice also relayed to police, again shortly after the murder, that Blakely might have stolen some drugs from the New York dealers.  The information from Guice did not mean much to police until September 11, when Avery first spoke with detectives and recounted the scuffle that took place inside Epps' apartment and how Blakely had managed to strike Lenworth Edwards and bloody his face.  Avery also reported that the table had been knocked over during the scuffle, something he had no way of knowing unless he was present.

Detective Taliano summed up the importance of the corroborating evidence well during the evidentiary hearing when he noted that "if it was simply [Avery's] statement to me, I would have walked away from him.  I didn't like him.  I didn't like his father" (TR 298).  Taliano summed up what gave Avery credibility (TR 299):

> None of those things [the broken table, the struggle in the Epps apartment, that Lenworth Edwards bled from a punch to the face], could have been the result of him making up a fabricated story because the story or even the event, even up to what happened at Floyd Epps' apartment . . . there was no way he could have known those things and tied those things into our physical evidence which he had more than a month earlier.  That's what gave him credibility.

31

This Court also finds Guice's recanted testimony wholly unreliable.  Guice does not specify which portions of her trial testimony are untruthful.  Rather, she merely states that she lied during her testimony.  She also states that Cleveland was in New York during the murder, but does not explain the basis for her knowledge of Cleveland's whereabouts.

The trial jury heard Guice testify that her motivation for coming forward with the jacket was a threat from police that she could be implicated in the murder if she was not forthright with her knowledge.  The jury was able to assess Guice's veracity with knowledge that she felt intimidated by police during the investigation.  And whatever her motivation, the blood results are not disputed.

Cleveland's ground for relief premised on *Napue* violations is denied.

**Third Ground: *Brady* Violation for Failure to Disclose Material Evidence**

In his third ground for relief, Cleveland alleges the State suppressed the following evidence favorable to Cleveland: (1) a police interview with Jeremiah Charlton Abdullah; (2) statements from Gwen and Willie Mincy corroborating Abdullah's allegations; and (3) Cleveland had worked as a federal confidential informant in connection with a food stamp fraud investigation during 1994–95.[3]

The prosecution must disclose evidence favorable to a defendant, and the failure to do so is a violation of a defendant's due process rights.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This includes evidence that could be used to impeach the credibility of a witness.  *Giglio v. United States*, 405 U.S. 150, 154–55 (1972).  To demonstrate a *Brady* violation, Cleveland must demonstrate that: (1) the evidence at issue is favorable to him, either because it is exculpatory or because it impeaches the case against him; (2) evidence was suppressed by the State, either willfully or inadvertently; and

---

[3] Cleveland also argues that the prosecution's use of Avery's "perjured" testimony at his trial is a *Brady* violation, but, as discussed above, this Court finds Avery's trial testimony to be reliable.

32

(3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  A defendant must show that the new evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  In the context of impeachment evidence, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, the nondisclosure of evidence affecting credibility falls within" the *Brady* rule requiring a new trial. *Giglio*, 405 U.S. at 154.

### Abdullah's Interviews

Jeremiah Charlton Abdullah was another Lorain drug dealer and user.  He came to Lorain Police with information about Blakely's activities the night she was murdered.  EX 4 is the audio recording of the August 21, 1991 interview, after he saw the advertised reward, and EX 27 the transcript.  Abdullah claims that on the night of the murder he served as Blakely's pimp.  He alleges two "Cuban" men in a red car approached him and asked if he knew where they could find a woman who would provide them with sexual favors in exchange for crack cocaine (APP 338–39).  He described the two men as being Hispanic in appearance (APP 351–54).  Abdullah told police he retrieved Blakely, and she left with the two Cubans in a red car around 11 or 11:20 p.m. (APP 344).  In exchange for his facilitation, the two Cubans gave Abdullah rocks of crack cocaine, and Blakely gave him a portion of the crack the Cubans had given her.  That was the last time he saw Blakely.  Later that evening, the Cubans came back to Abdullah looking for Blakely, claiming she had stolen $1,000 from them (APP 339–40, 345–46, 348–49).  While Abdullah believed the two Cubans killed Blakely (APP 335), he also told police he later heard that Blakely had stolen crack cocaine out of the jacket of "Shakime" (John Edwards' street name) earlier that evening at Charlie's Bar, the bar located across from the alley where Blakely's body was found (TR 136).

33

In June 1996, Abdullah signed an affidavit as part of Cleveland's post-trial motion (EX 28) (APP 155–70).  The affidavit tells a fantastical story about Abdullah's indirect involvement in Blakely's murder by the two Hispanic men and scarcely resembles the details he gave police in August 1991.  Abdullah now was able to provide the identity of the owner of the red car ("White Boy Jeff") and a myriad of other very specific details, including quotations from a conversation he allegedly had with members of the New York drug traffickers -- "New York" and "Justice" (APP 158–59) -- the night of Blakely's murder.  He also states that four days after Blakely's murder, on August 12, 1991, he saw one of the Hispanic men walking down a local street, and that he had a short conversation with this man (APP 160), details he never told police during his interview.

In a coincidental turn of events, in December 1991, Abdullah claims that while jailed on other charges, he encountered Lenworth Edwards and Avery at the Lorain Jail on the day Avery was to testify at Edwards' trial (APP 164–67).  Abdullah claims Avery confessed to him that he was lying about witnessing Blakely's murder, but he was in too deep to tell the truth.  Abdullah says he told Avery to demand more money before taking the stand and then to refuse to testify (APP 166–67). Wait -- there is more.  One month later in January 1992, still at the Lorain Jail, Abdullah claims he encountered one of the Hispanic men who killed Blakely, and Abdullah confronted him about the evening Blakely was murdered (APP 169–70).

Cleveland has not established that he suffered prejudice by the State's failure to provide him with the August 1991 Abdullah interview.  Abdullah did not witness Blakely's murder, and the statement he gave police is not exculpatory because Abdullah had no direct knowledge about who killed Blakely.  At best it suggests Blakely may have encountered two additional men the evening of the murder.  Further, Abdullah also implicated the New York drug dealers in the events surrounding

34

Blakely's last hours when he reported that Blakely had stolen crack cocaine from John Edwards.  Had Abdullah testified at trial, the jury would have been presented with competing stories from two individuals with credibility issues -- Abdullah and Avery.  But, Avery's claim that he witnessed the murder had corroborating physical evidence.  Of note, Abdullah testified at the trial of John Edwards (as did Avery), and Edwards was convicted.

### *The Mincy Siblings*

Detective Taliano conducted a recorded interview of Gwen Mincy on August 15, 1991 (APP 358).  Gwen grew up with Blakely and Epps.  Her brother Willie was in a relationship with Blakely at the time of her murder.

Gwen told Taliano she heard two different versions about how Blakely met her demise.  Under the first version, two Cubans killed Blakely after John Edwards told the two that Blakely was a "snitch" (APP 367).  Blakely had previously "copped a piece" for the two.  Gwen told Detective Taliano that she heard Blakely had an argument with "Shakim" (John Edwards) concerning drugs (APP 360).  In the other version, Gwen reported that she had heard John Edwards and the "guys from New York," including "Al Monday" (Cleveland), had something to do with Blakely's murder (APP 361).

Gwen also told Taliano that a man who lived across the street from her told her that he saw Gwen's brother talking to Blakely on the street the night she was murdered, and later in the evening saw Blakely leave the neighborhood in a maroon car (APP 362).

Like Abdullah, Gwen did not witness the murder.  Nor did she claim to see Blakely get into a vehicle the night she was murdered; rather, she only reported what she had heard from others.  She told Detective Taliano that she heard several different versions of what happened to Blakely, one of

35

which involved the New York traffickers being directly responsible for the murder.  Therefore, Cleveland did not suffer prejudice as a result of the omission of Gwen's interview.

Detectives Taliano and Resendez interviewed Gwen's brother, Willie, on September 9, 1991 (APP 372). Willie told police that he thought he saw Blakely in a white station wagon with two other occupants (APP 372).  Willie had no idea who would kill Blakely.

Willie's testimony is vague and is not exculpatory.  Further, it does not corroborate Abdullah's story as Cleveland contends in his Amended Petition. Cleveland has not established he suffered prejudice by the omission of Willie's interview.

### Avery's Federal Confidential Informant Work

Records reveal that Avery acted as a confidential informant for the U.S. Secret Service in connection with a 1994–95 food stamp investigation (APP 384–86).  In support of his claim, Cleveland presents a letter dated December 1996 (eleven months after Cleveland's trial) from Secret Service Special Agent Robert Wyche.  The letter is addressed to Assistant Prosecutor Rosenbaum and summarizes Avery's participation in the investigation.  On the second page of the letter, Agent Wyche recounts that in July 1995, a detective met with Avery at the Lorain Police Department after Avery reported that the target of the investigation knew he was cooperating with law enforcement and knew he was being "set up" by Avery.  Avery failed a subsequent polygraph on the issue and admitted that he had fabricated the story about the threat to try to bring an end to his involvement in the investigation, which would allow him to collect "reward" money (APP 385).  Cleveland alleges the prosecution knew about the July 1995 incident before Avery testified at Cleveland's January 1996 trial.

First, there is no evidence that the prosecution or Detectives Taliano or Resendez had evidence of Avery's untruthful conduct in connection with the Secret Service investigation until after Cleveland's conviction.  But, more to the point, Cleveland has not established prejudice with this evidence.  The jury heard evidence that Avery had given false statements *in connection with the very murder investigation* in which he was now testifying.  Cleveland's defense counsel vigorously cross examined Avery about his prior deception in the very case on trial.  The food stamp evidence, at best, was cumulative impeachment evidence.

### Fourth Ground: Prosecutorial Misconduct

Cleveland raises no fewer than fifteen instances of prosecutorial misconduct by Assistant Prosecutor Rosenbaum during the trial proceedings, including ten instances of misconduct during closing arguments and five during the evidentiary portion of the trial.

A claim of prosecutorial misconduct requires the defendant establish (1) the prosecutor's conduct and remarks were improper, and (2) the impropriety was flagrant, resulting in a due process violation.  *Hamilton v. Jackson*, 416 F. App'x 501, 506 (6th Cir. 2011) (citing *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002)).  "Flagrancy is analyzed by weighing [1] whether the prosecutor's conduct tended to mislead the jury or prejudice the accused, [2] whether it was isolated or extensive, [3] whether it was deliberate or accidental, and [4] the strength of the evidence against the defendant."  *Id.* (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)).

### *Closing Arguments*

(1)    Daymond John

Cleveland argues that during closing arguments, Rosenbaum made false statements about Daymond John, who Cleveland describes as his "most important alibi witness" (Doc. 34-1 at 17).

John, a longtime friend of Cleveland, testified at trial that he was with Cleveland in New York on August 8, 1991, sometime between 10 and 11 a.m. when Cleveland inquired about renting a van from John (APP 2086–88).  Defense counsel also elicited testimony from John and other witnesses, including Cleveland and Cleveland's mother, that John is a wealthy and respected businessman. During closing argument, Rosenbaum made the following statement (APP 2503–06):

> That leaves us with Damian Johns [sic].  He is the one person that they have tried to build as rich, but you can tell from this photograph that he has an average home, as well.  And Det. Resendez' testimony was  – Sgt. Resendez, was that it was not very well kept.  So he is not the millionaire that Mrs. Mitchell [Cleveland's mother] built him out to be.  And, once again, for some reason they have exaggerated their position.

> But I think there's something more interesting to note, and I want to share with you kind of my philosophy on a criminal case, especially like this.  And it's—and I would like you to adopt it if you find it to be logical.

> When you go about being a jury or in a search for the truth, if your cause is just and you are right, the more you dig, you will find little things that are consistent with your position.  And the more you look, the more they'll [sic] be there.  And if you do that today, you will arrive at the truth.

> And one place I want you to look is Defendant's Exhibit S.  You know, I was sitting there thinking to myself, well, this Johns [sic] looks pretty good.  He's sane.  He's not really related.  There's no tie-in.  He hasn't seen him for a long time.  He's got his own van business, and he picked up the TV on the 9th, and saw his buddy on the 8th.  Now, that's a killer for the State.

> So I started thinking, well, whoa, whoa, have we made a mistake here?  Do we need to re-evaluate what we're doing?  Have we accused someone that's wrong?  So I started examining the information we had.

> The only information I have, the result of what is here, and I find that Damian Johns [sic] is nowhere near what he says he is.  And you will see that, too.  He comes to you, and he is built as an independent semi-successful guy that has a van business, all these contacts, and that he makes an independent business.  And now he moves on to designing vans.  And they provide you, unfortunately for them, a little too many records.

38

And I started examining these records in what I thought was a search for the truth to see if there was a little tidbit there that maybe would discount what he had to say and reinforce that the State of Ohio was on the right track here.  And you can find what I found.  He says he's a van driver. Yet, on the last page where it lists his occupation, he says he's in maintenance.  He says he's the boss of his company, but on his Schedule A, he pays union dues. Well, the owners don't pay union dues.  But, more importantly, there's a little supporting schedule. And it shows where his $61,168 comes from, came from.  And what do you see there, Cleanest Maintenance.  What's the name of [Cleveland's father's] company?  Cleanest Maintenance.

So what do you have here?  You have the Defendant's father's employee coming into Court saying he is anything other than what he is, and telling you he saw the guy on the 8th by their own exhibit.  Well, they should have looked a little harder at it.  And that's there for you to consider.

So the $61,000 van driver, independent, who just doesn't have his journal entry like he says he does, nor anything during that year, is an employee of the Defendant's father.  He's a union man, and he works for Cleanest Office Maintenance, not what he said he was.

He does own, apparently, according to a half of the title you have here, a Ford van that he bought in '90 with 62,361 miles on it.  Other than that, I totally submit to you that you can totally trash what Mr. Damian Johns [sic] has to say, and maybe think to yourself why did they come here with all these lies.

Cleveland contends these statements are a misrepresentation of the trial evidence concerning John's wealth and ties to Cleveland, that John was a successful businessman in January 1996, as he is today, and it was improper for Rosenbaum to suggest to the jury otherwise (Doc. 34-1 at 21–22).  But, there was competing evidence on John's business ventures from which differing conclusions could be drawn.  *See United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996).

Cleveland also argues John never claimed he was the owner of Queens Van Plan, Inc. (Doc. 34-1 at 23).  However, that was exactly John's testimony (APP 2085) ("I was owner/operator of Queens Van Plan, Inc.  It was my umbrella company and I worked under them so if they received a trip into the office for say, $100, they would take out $15 and I would receive $85.").

39

Cleveland also argues Rosenbaum improperly suggested that John had attempted to hide or misrepresent his business relationship with Cleveland's father, who owned a business called Cleanest Office Maintenance which contracted with John to perform services (Doc. 34-1 at 24–25).  But, Rosenbaum did not suggest John lied about his relationship with Cleveland's father.  He did suggest John had a financial motive and called his testimony into question by directing the jury's attention to it.  Commenting on such impeachment evidence is not improper.

The prosecutor's comments about John were not improper and, in any event, cannot be characterized as flagrant or a denial of a fair trial.

(2)     Misstatements about Cleveland Family Finances

During closing argument, Rosenbaum made the following statement about evidence relating to the Cleveland family financial status (APP 2501):

> However, I think it's sufficient to note for some reason that the defense felt the need to build that he came from a very rich, affluent family and wanted for nothing.  I think if you look at the house, you'll see that that's not true.

Cleveland contends this was a misstatement of the trial evidence and points out that on cross examination Cleveland denied his father was rich, and described his father as "just very well off" (APP 2408).  This argument, however, belies the trial testimony.

The comment was in the context of Rosenbaum's attack on two of the four alibi witnesses offered by Cleveland.  He described "a turn in fact" by "some of the things that the mother and his fiancee said, especially about the father's house" (APP 2500).  Rosenbaum then argued (APP 2501):

> The father's house is not what they cracked it up to be.  Now, they're stuck with arguing that it is really, really nice on the inside.  Well, look at the house from the outside.  I would say it's very average.  However, I don't know what that, to be honest with you, has to do with anything.  Rich people can sell drugs, poor people can sell drugs.

40

This Court agrees that what kind of house Cleveland's father lived in had no relevance on Cleveland's guilt.  But, defense counsel did elicit testimony from Cleveland's girlfriend that Cleveland was "spoiled" by his father and that his father provided Cleveland with credit cards (APP 2155–56).  Further, the girlfriend testified on direct examination that Cleveland's father lived in a "very big house" with a "big, big living room[,] [g]lass on the walls, glass tables.  It was a beautiful house, beautiful house" (APP 2155).  She also testified that Cleveland came from an "affluent" neighborhood (APP 2156).  On direct examination, Cleveland's mother testified similarly that Cleveland's father supplied him with credit cards, vehicles and nice clothes (APP 2256–60).  Therefore, the prosecutor did not misrepresent the trial evidence when during closing arguments he raised questions about the veracity of defense witnesses' testimony.

(3)     <u>Misstatements about Salvage Cars</u>

During closing arguments, Rosenbaum called into question the credibility of Cleveland's mother by pointing out that she may not have been privy to the truth from her son in certain scenarios (APP 2507–08):

> The fact that the mother has to tell you that the Defendant is a hard-working boy, he builds salvaged cars, well, you cannot rebuild a salvaged car.  It's totalled [sic] because it's not economically feasible to fix it up.

> And then it comes out – well, my mom wasn't quite right.  I am a car thief.  He is a car thief that graduated from that to selling drugs in the City of Lorain as William Avery, Jr., tells it.

Cleveland argues this was a misstatement of the evidence because Cleveland testified that rebuilding totaled cars was economically feasible and there was no testimony to the contrary.  Cleveland contends "[t]he prosecutor's statement that 'you cannot rebuild a salvaged car' was a clear

41

misstatement of the evidence because the only 'evidence' supporting such a claim was the prosecutor's personal opinion" (Doc. 34-1 at 26).

However, the prosecutor was asking the jury to call on their life experiences to evaluate the mother's testimony in light of Cleveland's own admission on cross examination that he had been arrested numerous times for stripping parts off stolen cars and stealing cars (APP 2399–2400). Even if the comment could be classified as misconduct, it simply does not raise to the level of "flagrant."

> (4)    Misstatements about Avery's Testimony

Cleveland next takes issue with Rosenbaum's statement that Avery "consistently told from the beginning the same story, after he finally got all the truth out, after the games were over with his father, after he realized he wouldn't be arrested" (APP 2508). Cleveland contends this misstated the trial evidence which showed Avery had been an inconsistent witness -- that he had previously recanted his testimony in open court during Lenworth Edwards' original trial. Cleveland further argues that this statement constituted improper vouching and commentary on the credibility of a witness and cites *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005), as support.

"Vouching occurs when a prosecutor places the prestige of the government behind a witness with the prosecutor's personal assurance of the witness's reliability." *Walker v. Morrow*, 458 F. App'x 475, 490 (6th Cir. 2012). "Vouching also occurs when a prosecutor expresses his 'personal belief' in the defendant's guilt." *Id.* at 490–91. In *Hodge*, the Sixth Circuit held "[i]t is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." 426 F.3d at 378.

Certainly Avery's testimony was critical to Cleveland's prosecution. However, Rosenbaum's qualification that Avery had been consistent "after he finally got all the truth out" is not a

42

misstatement of the evidence.  After Avery was jailed for perjury, he told his complete version of events during his January 1992 interview that included Avery witnessing Blakely's murder.  And, Avery's story had remained consistent from that point in time through Cleveland's trial.  The prosecutor's statement about Avery does not reflect the kind of comments at issue in *Hodge*.  There, during closing arguments, the prosecutor stated that the defendant "is lying to extricate himself from what he's done" and then stated that the victim "is absolutely believable, her family is absolutely believable."  426 F.3d at 377.  Further, Rosenbaum did not "vouch" for Avery's veracity without tethering it to evidence that Avery's story was consistent between January 1992 and Cleveland's January 1996 trial.

Nor does the fact that Rosenbaum used the word "truth" to describe Avery's version of events automatically render the statement improper.  Neither the Supreme Court nor the Sixth Circuit has forbade wholesale use of such words in closings.  *See, e.g.*, *Cristini v. McKee*, 526 F.3d 888, 902 (6th Cir. 2008) (finding no misconduct where prosecutor repeatedly called witnesses "liars" because the prosecution's argument the witnesses were untruthful was coupled with a "detailed analysis of the record," and "[e]ach time the prosecutor said some witness had lied, he explained why the jury should come to that conclusion").  Further, Avery's changing version of events was a centerpiece of the trial, and the jury knew it would be the arbiter of which version of events to believe and whether Avery's version should be credited or not.

(5)     Misstatements about Delphina Guice

Cleveland contends Rosenbaum also made misstatements about the trial testimony of Guice, a hostile prosecution witness whose prior audio recorded statements to police were also entered into evidence.  During trial, Guice testified that she only gave statements to police because they had used

43

intimidation tactics during her interviews.  Cleveland takes issue with Rosenbaum's assertion that

Guice, scared of Cleveland and his co-defendants, did not testify truthfully at trial (APP 2513–14):

> Delphina Guise [sic] comes into the Courtroom, and the longer she's here, the uglier she gets.  And she starts yelling and screaming about what the State did to her, they threatened her this and they threatened that.
>
> Well, you have those 2 tapes, and you're going to hear that second time Lenworth Edwards wasn't upstairs.  And you're going to see it's very, very friendly.  And, please listen to these tapes.  It's part of the evidence.  And you see if that tape is consistent with what she says the Government did in her home.  And you will see it's not.
>
> And then I would like you to ask yourselves what kind of human being or group of people inspires that kind of fear that when they come face-to-face, the witness comes face-to-face with him, that they turn on the street, and they'll say anything in front of him, even if it's wrong.
>
> To be on his side, you threatened me this, you made me do this, what are you bringing me here for.  She's terrified of this guy.  And you will see that she lied under oath because of it.  And you have those 2 tapes that will prove it.
>
> So factor that into your equation as to which side is telling you the truth.  And see if Delphina was really wronged by the police in this case, or if whenever she comes to Court, she acts consistent with being face-to-face with someone that kills people on the streets of this community.

Using the adjective "ugly" to describe the hostile examination was not improper.  Cleveland

further asserts there was no evidence that he threatened Guice.  It was improper for Rosenbaum to

speculate Cleveland may have threatened Guice.  It also was improper for Rosenbaum to argue to the

jury that Guice's reluctance was based on a fear of Cleveland because there was no evidence of such

a threat.  *See Palmer v. Haviland*, 2006 WL 1308219, at *13 (S.D. Ohio 2006) (finding similar

comments improper).  However, a review of the record as a whole reveals that the impropriety was

not flagrant so as to deny Cleveland a fair trial.  The implication was isolated and the differences

44

between Guice's trial testimony and the recorded interviews were not crucial to the prosecution or defense's case.

      (6)      <u>Attacks on Defense Counsel</u>

      Cleveland next contends Rosenbaum committed misconduct by "attacking the integrity of defense counsel" (Doc. 34-1 at 28) when he made the following statements during closing arguments:

> You add all these things up, ladies and gentlemen, things that William Avery, Jr., tells you, the undeniable things, the behavior of the Defendant, the knowing falsehoods that for some reason the defense felt they had to put in here to misrepresent their position. (APP 2514)

> And [defense counsel's] representations that [Avery] came forward about the murders is false. And if you have any evidence to that in your notes or in your collective memories, then I will be shocked, because that's, like many of the other things [defense counsel has] said, is absolutely note true. (APP 2549)

> [J]ust like the fact that they need to lie, just like the fact that they need to lie, just like the fact that they need to misrepresent who Damian Johns [sic] was to create an alibi. (APP 2555)

> And that shaky alibi that we now know is put on by people that are purely loyal to the Defendant, and is predicated on lies and misrepresentations. (APP 2557)

Cleveland contends that the comments "were not isolated, but repeated, and calculated to overcome the weak evidence" against him (Doc. 39 at 77).

      This Court agrees with the State's characterization of the statements as being directed at the defense's argument and witnesses rather than at the integrity of defense counsel (*see* Doc. 35 at 71–72). Cleveland fails to articulate how these statements fall outside the "wide latitude" afforded the prosecution during closing argument "to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009). These comments were not improper.

45

(7)     Assertions Trial Witnesses Lied

The next alleged instance of misconduct in Rosenbaum's closing occurred when Rosenbaum used variations of the words "truth" and "lying" to describe the testimony of various witnesses. Specifically, Cleveland argues the following statements were improper:

> They [Teague and Hawkins] rode down here together.  For some reason, they testified falsely together about that, in their zeal to condemn the State.  (APP 2503)

> So you have the mother, who's obviously biased; the fiancee, who's obviously biased. And you have the woman from upstairs [Teague], who for some reason chose to lie about Det. Taliano's presence in what you might interpret to be a fit of anger.  (APP 2503)

> William Avery Jr. admits to you what he was, and you can see he is no rocket scientist, yet he has consistently told from the beginning the same story, after he finally got all the truth out, after the games were over with his father, after he realized he wouldn't be arrested.  (APP 2508)

> What did Det. Sgt. Taliano find that told him that he knew that William Avery Jr., was telling the truth?  Things that were not released to the public.  (APP 2509)

> And you will see that she lied under oath, because of it.  And you have the two tapes that will prove it.  (APP 2513–14)

> You're going to find the State of Ohio is telling you the truth.  (APP 2514)

> He's consistently all along told us, once he got the entire truth out, this man headed the drug conspiracy, took him over there to do this.  (APP 2554)

> And all these things tell you that what William Avery Jr. has to say to you is true. (APP 2556)

> Now I'm asking you to do your job, and I am representing—well, I'm arguing to you the evidence supports a common sense conclusion that what William Avery Jr., because of these undeniable facts that everybody else has found that weren't available to anyone else, he is telling you the truth.  (APP 2557)

Cleveland again directs this Court to *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005), but beyond that does not elaborate how each of these nine statements is improper.

Cleveland seemingly advocates for misconduct anytime a prosecutor uses the words "truth" or "lie" during argument.  But, as discussed above, that is not the law in this Circuit, and Cleveland has cited no case that stands for such a proposition, nor could he.  *See, e.g.*, *Cristini*, 526 F.3d at 902 (finding no misconduct where prosecutor repeatedly called witnesses "liars" because the prosecution's argument the witnesses were untruthful was coupled with a "detailed analysis of the record" because "[e]ach time the prosecutor said some witness had lied, he explained why the jury should come to that conclusion").  This case is once again distinguishable from *Hodge* because the prosecution's statements are tethered to the record evidence and do not have the appearance of originating from the prosecutor's personal opinion or evidence outside that presented to the jury.

(8)  Shifting the Burden of Proof

Cleveland contends that during closing arguments, Rosenbaum "urged the jury to convict by arguing that Cleveland had failed to establish his innocence" (Doc. 34-1 at 30) and cites the following statements, without elaborating how these statements denied him a fair trial:

Now, you have not heard from anyone from the defense that is not directly tied to him to prove that he was there.  (APP 2499)

Other than that, he has no undeniable proof that he was [in New York] on [August] 8th.  (APP 2500)

So it becomes very, very important for you to determine what kind of evidence he has to document that he was, in fact, still in New York on [August] 8th.  (APP 2500)

Without reasonable doubts, we've proven our case.  (APP 2551)

Cleveland's argument is misplaced for several reasons.  First, Cleveland presented an alibi defense at trial.  The prosecution is permitted to call into question Cleveland's alibi.  *See Cristini*, 526 F.3d at 902.  Second, this Court agrees with the State that the burden of proof comments, about which Cleveland complains, are appropriate as the State must prove its case beyond a reasonable doubt.

47

Third, the trial court properly instructed the jury on the burden of proof (*see* APP 2558–59, 2574), and the prosecutor's comments were aligned with those instructions.

(9)     Diluting Burden of Proof (Witnesses)

Cleveland next complains that Rosenbaum committed misconduct during closing arguments when he improperly stated (APP 2498–99):

> The Judge is going to define credibility, and he's going to instruct you on your responsibilities.  But, basically, it boils down to you as thinking human beings can decide to believe whatever you think is reasonable, and disbelieve what you think is not.

Cleveland contends this comment was improper because it "encouraged the jury to draw conclusions about the truth or falsity of witness statements without considering whether or not the government had produced evidence to support its witnesses' allegations" (Doc. 34-1).

This argument is wholly meritless.  Without question, jurors are permitted to draw on the tests of truthfulness and common sense that they apply in their daily lives.  The trial court properly instructed the jury on witness credibility, and that instruction is substantially similar to the challenged statement (APP 2561–63).

(10)     Diluting Burden of Proof (Analogy)

Cleveland contends the prosecutor committed misconduct when he made the following analogy about reasonable doubt during closing arguments (APP 2550–51):

> What is proof beyond a reasonable doubt?

> Think about an operation.  It's a very important thing.  The doctor tells you you have a cancerous tumor.  You know you haven't been feeling well.  You can't see it.  You can't feel it.  He says you need an operation right away.  That's a very important decision.  That's one of the most important of your own affairs.

*   *   *

48

You're full of doubt.  What happens?  Is that the right thing to do?  Should I do it?
Will I use the anesthetic?  Will things happen?  All of that stuff, but you made the
decision because you eliminated reasonable doubt.

How about buying a house?  If you think back to when you bought your house the first
time, you're fraught with doubt.  Can I make the payment?  Am I going to be in
trouble?  But you do the best you can.  You go on.

Well, I submit to you that you have more knowledge to what you heard from the State
about the events of August 8, 1991, than you would if you were called upon to decide
whether you had that tumor and you needed that operation.  There is less doubt here.
So that illustrates what is a reasonable doubt and what is not.  You could have some
doubts, but are they reasonable?  Without reasonable doubts, we've proven our case.

Cleveland contends these comments on reasonable doubt were "a thinly-veiled claim that, even if the

jury was uncertain as to the correct verdict, they should trust the prosecutor and return a conviction"

(Doc. 34-1 at 31).

This argument fails too.  The trial court gave the jury an appropriate reasonable doubt

instruction (APP 2558–59, 2574).  *See United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors . . .

taken an oath to follow the law as charged, and they are expected to follow it.").  Further, whether or

not the prosecutor's analogies were helpful guidance to the jury, they were not a misstatement of the

law, and did not distort the burden of proof.  And beyond, even if misstatements, they were not so

flagrant as to deny Cleveland a fair trial.

### *Evidentiary Phase of Trial*

(11)     Commenting on Cleveland's Prearrest Silence

Cleveland claims Rosenbaum improperly questioned Cleveland on cross examination.  Before

Cleveland went to trial for Blakely's murder, he was arrested in Virginia on drug charges.  On cross

examination, Rosenbaum asked Cleveland why he did not come forward with his alibi after he learned

he was wanted for Blakely's murder or at least attempt to find out the date he was accused of

49

murdering Blakely (APP 2420–24).  Cleveland testified he did not attempt to learn more information

because he was afraid of going to jail (APP 2420–21):

| | |
|---|---|
| PROSECUTOR: | And you're telling this Court and Jury that even though you were wrongfully accused, you made no effort whatsoever to find out when [Blakely] was killed so that you could establish your innocence? |
| CLEVELAND: | No. |

*  *  *

| | |
|---|---|
| PROSECUTOR: | I thought you said that you were afraid to turn yourself in because you were afraid of jail? |
| CLEVELAND: | And that, too.  That was just a fear I had of jail. |

Rosenbaum attempted to rebut this testimony by eliciting testimony from Cleveland that he

had actually been in jail a number of months for the Virginia charges, so a fear of jail was not

motivation to not learn about the details of Blakely's death (APP 2422):

| | |
|---|---|
| PROSECUTOR: | How long did you spend in Virginia in jail? |
| CLEVELAND: | Till May, 3 months. |
| | |
| PROSECUTOR: | So during these 3 months, you no longer had to be afraid of going to jail if you tried to find things out, because you were already there, right? |
| CLEVELAND: | Correct. |

Without citation to any authority, Cleveland contends this line of questioning was improper

commentary on Cleveland's silence.  As the State correctly points out, there is no indication

Cleveland had been arrested on the Ohio charges during the time in question.  The docket sheet

indicates Cleveland was arrested for Blakely's murder on May 16, 1995 (APP 1542).  In certain

circumstances it is permissible for a prosecutor to comment on a defendant's prearrest silence.  *See*

*Jenkins v. Anderson*, 447 U.S. 231, 238 (1980) ("[T]he Fifth Amendment is not violated by the use

of prearrest silence to impeach a criminal defendant's credibility.").  In *Jenkins*, a murder defendant

50

claimed he killed in self defense.  *Id.* at 235.  At trial, the prosecutor attempted to impeach the defendant's credibility by suggesting the defendant would not have waited two weeks to report the alleged attack by the victim if he had killed in self defense.  *Id.*  The court found this line of cross examination presented no constitutional issues.  *Id.* at 238.

Much like in *Jenkins*, the purpose of this line of questioning from Rosenbaum was to call into question Cleveland's alibi and impeach his testimony that he was afraid of jail.  The prearrest silence was not used as substantive evidence of Cleveland's guilt.  *See also Combs v. Coyle*, 205 F.3d 269, 281 (6th Cir. 2000) ("[U]se of a defendant's prearrest silence as substantive evidence of guilt is significantly different than the use of prearrest silence to impeach a defendant's credibility on the stand.").  The prosecutor's questioning was proper.

(12)    Commenting about Co-Defendants' Convictions

Cleveland contends that during Cleveland's cross examination, the prosecutor "implicitly urg[ed] the jury to return a conviction based on the earlier convictions of L. Edwards and Benson Davis" (Doc. 34-1 at 32).  Specifically, Cleveland appears to take issue with the following questioning (APP 2417–18):

| | |
|---|---|
| PROSECUTOR: | But you had your friend, Lenworth Edwards, had a full-blown trial on this matter, did he not, a public hearing? |
| CLEVELAND: | But I wasn't in touch with his family. |
| | |
| PROSECUTOR: | I see.  You weren't in touch with him.  Nan Brown, Delphina Guise [sic], you weren't in touch with the newspapers? |
| CLEVELAND: | No. |
| | |
| PROSECUTOR: | There was no way that you could have found out.  And who else had a public trial on this matter while you were missing? |
| CLEVELAND: | Benson Davis. |

51

| PROSECUTOR: | So you had 2 public hearings, William Avery, Jr., testifies publicly, every shred of evidence that's before this Court and Jury has been played out publicly? * * * And it's your testimony that you could not find out what day you were wrongfully accused of killing someone? |
| CLEVELAND: | No. |
| | |
| PROSECUTOR: | Nor did you make any effort to find that out so you could clear yourself? |
| CLEVELAND: | I didn't make any effort. |

The questioning on cross examination was designed to impeach Cleveland's testimony about his alibi and his explanation about why he did not report sooner his alibi to police. The prior trials were relevant to proper cross examination subject matter, and the prosecutor did not urge the jury to convict Cleveland merely because others had been convicted. Further, in context, the remarks did not affect Cleveland's substantial rights or deny him a fair trial.

(13)    Introducing Privileged Conversations

Cleveland next contends the prosecutor committed misconduct during Cleveland's cross examination when he "attempted to elicit the substance of privileged conversations between [Cleveland] and his attorney" (Doc. 34-1 at 32). Cleveland provides no further explanation of this claim. He directs this Court to a portion of the cross examination where Rosenbaum questioned Cleveland about when he learned that the prosecution was going to seek to introduce certain exhibits at trial. Rosenbaum asked when Cleveland knew the "State was going to have pictures of [his] father's house and get the receipt from P.C. Richards, the second receipt that [Cleveland] didn't have that wasn't marked before the weekend" (APP 2410). On cross examination, the prosecution was attempting to impeach Cleveland by suggesting he was altering his testimony based on knowledge the prosecution planned to use these exhibits. Rosenbaum was not trying to elicit the substance of

52

Cleveland's communications with trial counsel. The questioning was not improper and, in any event, did not deny Cleveland a fair trial.

(14)    Injecting Broader Social Issues

Cleveland argues that throughout his murder trial, Rosenbaum attempted to influence the jury by improperly focusing on the scourge of illicit drug trafficking in Lorain. Cleveland faults Rosenbaum for eliciting the following statement from Detective Taliano (APP 1986):

> We had identified those people as part of a conspiracy that brought drugs and violence to the City of Lorain and Elyria and we had maintained ongoing surveillances and investigations and were probably close to making an arrest.

Cleveland also cites Rosenbaum's reference to him as a "rich drug kingpin" during closing argument in support of his argument (APP 2557):

> [T]his man with prior calculation and design, was responsible for the events of all these people being at the right place and the right time to take Marsha Blakely's life if she didn't come up with her stuff. So that he could be a rich drug kingpin, and not just a little leader of a cartel when he came from New York to spread his poison to Lorain.

These comments were not improper because they were relevant to the murder prosecution. The murder occurred against the backdrop of drug trafficking and the investigation and leads inevitably included information about how individuals fit within the drug trafficking operation. Drugs provided the alleged motive for the murder and the basis for Cleveland's admitted presence in Lorain during the summer of 1991. It also provided context to Cleveland's own testimony. The prosecutor did not encourage the jury to convict Cleveland for Blakely's murder because he was trafficking drugs; rather, he encouraged the jury during closing arguments to convict Cleveland of murder because he had Blakely murdered for stealing drugs. Further, the comments did not deny Cleveland a fair trial.

(15)    Mistreatment of Witnesses

Finally, Cleveland argues that Rosenbaum mistreated many of the trial witnesses by badgering them on the witness stand, insulting them, and arguing with them (*see* Doc. 34-1 at 33). This Court has reviewed the trial transcript and rejects Cleveland's characterizations of the questioning.  The prosecution's questioning of defense witnesses was neither out of line nor improper, and cannot support a claim of prosecutorial misconduct.

*  *  *

This Court has also considered the cumulative effect of the alleged instances of misconduct cited by Cleveland, and rejects Cleveland's argument that the "combined effect deprived [Cleveland] of a fair trial" (Doc. 39 at 79).  As noted above, this Court finds only one instance of questionable impropriety (suggesting to the jury in closing argument that Cleveland may have threatened Guice). Beyond the scant record of improper comments, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  A review of the prosecutor's arguments and questioning in the aggregate in no way supports the conclusion that Cleveland was denied due process.

**Fifth Ground: Ineffective Assistance of Trial Counsel**

Cleveland contends his trial counsel, Mary Papcke, was constitutionally deficient by failing to: (1) object during the prosecution's closing argument; (2) investigate, including neglecting to interview Abdullah, Donaphin, and a friend of Blakely's named Clarence Thomas; (3) investigate shortcomings in the police investigation; (4) review the recorded interviews of Avery when given the opportunity to do so at trial and to conduct an adequate cross examination of Avery; (5) object to

54

Detective Taliano's testimony about Avery's prior statements; and (6) object to prejudicial and improper statements by the trial court.

Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), an attorney is constitutionally ineffective if "counsel's performance was deficient" and "the deficient performance prejudiced the defense."

 To establish deficient performance, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed in the Sixth Amendment" and overcome a "strong presumption" that counsel's choices lie within the "wide range" of acceptable performance.  *Id.* at 687, 689.  "Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1485 (2010).  And, "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one."  *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 788 (2011).

With respect to prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.* at 693.  Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at 687.

At the outset, Cleveland makes a broad accusation that Papcke was suffering from mental illness throughout Cleveland's trial and appellate proceedings during 1995–97 and cites the opinion from an unrelated disciplinary proceeding against Papcke that indicated she suffered from adjustment disorder, major depression, and post-traumatic stress disorder (Doc. 34-1 at 35).  *See Disciplinary*

55

*Counsel v. Papcke*, 88 Ohio St. 3d 161 (2000). Cleveland does not allege how Papcke's mental illness adversely impacted his representation, other than the shortcomings identified above and discussed below.

       (1)      <u>Failing to Object During Closing Arguments</u>

Cleveland contends Papcke was constitutionally deficient because she "failed to raise even a single objection to the misconduct of the prosecutor in closing argument" (Doc. 34-1 at 35). In *Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005), the Sixth Circuit held that trial counsel was ineffective because he "fail[ed] to object to any aspect of the prosecutor's egregiously improper closing argument."

Cleveland's reliance on *Hodge* in this instance is misplaced because that case involved severe prosecutorial misconduct. Here, as discussed above, nearly all the closing argument statements about which Cleveland complains were not improper, and the single instance of questionable impropriety (suggesting Cleveland had threatened Guice) does not rise to the level of a due process violation. Papcke's failure to object to the prosecutor's closing argument was not objectively unreasonable. Nor is there a reasonable probability that, but for the failure to object in this case and obtain a curative instruction, the result of the proceedings would have been different. *See Wilson v. Bell*, 368 F. App'x 627, 636 (6th Cir. 2010) (finding no ineffective assistance of counsel where counsel did not object to prosecution's improper vouching during closing argument).

       (2)      <u>Failing to Investigate Cleveland's Alibi</u>

Cleveland next contends Papcke was constitutionally defective because she failed to fully investigate his alibi defense that he was in New York August 7–8, 1991. He cites the following specifics: (1) not interviewing Donaphin who could have testified that Cleveland was in New York

late into the evening of August 7; (2) failing to elicit testimony from Cleveland about his whereabouts the night and early morning of August 7–8, 1991, and instead asking Cleveland about his actions during the day on August 8; and (3) "fail[ing] to properly interview and prepare for Ayasha Teague's trial testimony, leading the trial court to strike Teague's testimony due to counsel's failure to turn over Teague's calendar" (Doc. 39 at 46).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and "a particular decision to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690–91. "Thus, the question is whether 'reasonable professional judgments support the limitations on investigation.'" *Avery v. Prelesnik*, 548 F.3d 434, 437 (6th Cir. 2008) (quoting *Strickland*, 466 U.S. at 691). To evaluate a claim of prejudice in the context of failing to investigate an alibi, "the court must assess how reasonable jurors would react to the additional alibi testimony had it been presented." *Avery*, 548 F.3d at 439. And, the availability of alibi testimony must be evaluated in light of the total evidence supporting a defendant's conviction. *Id.*

At trial, the prosecution conceded Cleveland was in New York sometime during the day on August 7, 1991 to meet with his probation officer. Papcke presented evidence from Daymond John that Cleveland was in New York on August 8 around 10 a.m. inquiring about renting a van to move a television. Donaphin's affidavit, signed in 2006, alleges that he saw Cleveland in New York around midnight on August 8.

Cleveland is critical of Papcke for not contacting Donaphin. But, there is a dispute about whether Cleveland told Papcke about Donaphin, or identified him in a manner that would enable

Papcke to follow up.  Cleveland claims he did, but also stated at this Court's evidentiary hearing that at the time of his trial he did not recall seeing Donaphin on the evening of August 7 (TR 150):

> I knew I had just seen him that week.  I didn't know this day that this happened that night.  I just knew I seen him during that week that was back in New York, but I told her to get the investigator to investigate it, you know, go check with him and several others, many of whom she never went and talked to, or my investigator.

Cleveland also testified that he did not know Donaphin's real name until years after his trial, claiming he "thought his name was David Green" and did not testify at trial about seeing Donaphin (or a man named David Green) the evening of August 7 (TR 151).

Cleveland's claim that he told Papcke of Donaphin is not credible.  Cleveland was able to provide testimony about a meeting with a probation officer on August 7 and about renting a van in New York at 10 a.m. on August 8.  He does not explain how he recalled these details with specificity but was unable to recall encountering Donaphin and a "bunch of guys" during the critical hours until after his trial (TR 147).

This Court also finds Donaphin's testimony on this point is not credible.  He is not impartial; he readily acknowledges he is a friend of Cleveland and in regular contact with Cleveland; and that he was formerly involved in drug trafficking with Cleveland (Doc. 76-5 at pp. 11–12).  Also undermining Donaphin's testimony is that he cannot remember any other individuals with him the night of August 7 at the Davis home.  He claims the reason he remembers seeing Cleveland that particular evening is because August 7 was his birthday, but also concedes he has no recollection of other birthdays (pp. 17, 23).

Cleveland's criticism of Papcke's direct examination of him at trial centers on Papcke's failure to question Cleveland about his whereabouts the evening and early morning hours of August 7–8. But Papcke did ask Cleveland about his whereabouts during the relevant hours (APP 2360):

58

PAPCKE:          Okay.  What did you do that evening, Al, on the 7th?
CLEVELAND:      Okay.  Put the carpet there.  I don't remember anything.

Further, Cleveland makes no allegations that he informed Papcke of a specific alibi for those hours (other than being in New York generally).  This Court finds it hard to believe that Papcke would have not elicited such an alibi from Cleveland if one was available.

The next issue concerns Teague's calendar.  The trial court excluded the calendar at trial because Papcke failed to timely disclose it to the prosecution.  Teague testified at Cleveland's trial, but the testimony was ordered stricken.  Assuming Papcke's performance was deficient for not timely disclosing the calendar, Cleveland cannot demonstrate prejudice.  Teague and Cleveland were very close, and Teague's writings in the calendar about Cleveland are highly suspect.  A jury would view this evidence with suspicion because the calendar was subject to after-the-fact manipulation and because Teague's trackings of Cleveland's comings and goings is odd.  Moreover, the calendar does not suggest an alibi for Cleveland during the critical time period -- the evening of August 7 and the morning of August 8.  The calendar would not have turned the tide, and Cleveland suffered no prejudice by the omission of the calendar.

(3)      <u>Failing to Investigate Abdullah's Statement</u>

Cleveland next claims Papcke was deficient for insufficiently investigating the statement Abdullah gave to police about Blakely and the two Hispanic men.  As discussed previously, Abdullah's interview with police was not particularly helpful to Cleveland's defense.  Cleveland suffered no prejudice as a result of Papcke's failure to call Abdullah as a trial witness because Abdullah did not witness Blakely's murder, and his statement to police also implicated New York drug dealers in Blakely's last hours.  Further, Abdullah's credibility was shaky at best.  Of note again, Abdullah testified at the trial of John Edwards, and the jury convicted Edwards.

59

Cleveland's additional arguments that trial counsel was defective for not investigating corroborating evidence to Abdullah's account by interviewing Elia Alston and Clarence Thomas also fail. The affidavits of Alston and Thomas do not undercut the prosecution's theory of the case and the supporting physical evidence.

      (4)    <u>Failing to Investigate the Police Investigation</u>

Cleveland's criticism of Papcke's failure to discover the blood on the rubber sleeve at Epps' crime scene (which would have narrowed the time frame for which Cleveland needed an alibi) is without merit. As previously discussed, the Dehus affidavit has been undermined by testing proving the rubber sleeve blood did not belong to Blakely.

      (5)    <u>Avery's Cross Examination</u>

Cleveland contends Papcke was ineffective because she did not use Avery's recorded interviews with police during trial. It was perfectly reasonable for Papcke to rely on Avery's prior testimony to impeach him on cross examination. That she did not use the tapes does not demonstrate deficiency. Papcke extensively questioned Avery about the inconsistencies between his testimony and prior statements. Further, Cleveland cannot demonstrate prejudice because Avery's inconsistencies were detailed and well known to the jury.

      (6)    <u>Failing to Object to Detective Taliano's Testimony</u>

Cleveland next faults Papcke for not objecting during Detective Taliano's direct examination when the prosecutor elicited testimony describing statements Avery made to Taliano. Cleveland contends Papcke should have objected because the statements "were made after Avery Jr. had acquired a motive to lie [*i.e.*, the reward money]" (Doc. 34-1 at 37). However, this line of questioning

60

was not improper.  That Avery had a motive to lie because of the reward money is proper cross examination but not a basis for excluding Taliano's testimony about the investigation.

>    (7)    Failing to Object to Alleged Improper Statements by the Trial Court

Cleveland contends the trial judge acted improperly throughout the course of Cleveland's trial, and that Papcke was deficient for failing to object to the improprieties.  Cleveland contends the trial court made statements that "implied that [Papcke] was wasting everyone's time, and implicitly encouraged the jury to view Cleveland's case with impatience" (Doc. 34-1 at 38).  This Court has reviewed the entire trial transcript and rejects this characterization out of hand.  The trial judge did not misbehave and trial counsel was not defective for not objecting.

**Sixth Ground: Ineffective Assistance of Appellate Counsel**

In his final ground for relief, Cleveland contends Papcke was also constitutionally defective on direct appeal because she failed to raise an ineffective assistance of trial counsel claim.  Claims of ineffective assistance of appellate counsel are reviewed under *Strickland*'s two-prong test.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Cleveland has not established appellate counsel was defective.  Under Ohio law, an attorney who represents a criminal defendant at trial and on direct appeal is not expected to raise his or her own ineffective assistance on direct appeal.  *See State v. Lentz*, 70 Ohio St. 3d 527, 530 (1994).  Instead, criminal defendants are permitted to raise these claims in a petition for post-conviction relief.  *Id.* That Cleveland did not timely file a post-conviction petition is not an error properly assigned to Papcke.  Further, this Court notes it has fully considered Cleveland's claims of ineffective assistance of trial counsel, applying a de novo review, and has rejected each claim under *Strickland*.  Therefore,

Cleveland was not prejudiced by Papcke's election not to raise the ineffective assistance of trial counsel claims on direct appeal because they would not have succeeded.

### Cumulative Considerations of Allegations in Grounds One through Six

Having rejected each of the six grounds for relief presented by Cleveland, this Court considers Cleveland's argument that "[e]ven if this Court does not find any single violation of Cleveland's constitutional rights egregious enough to issue a writ, the cumulative effect of these errors requires habeas relief" (Doc. 39 at 72).  This Court declines to do so.  Cleveland's trial cannot be described as fundamentally unfair.  *See Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).

### CONCLUSION

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law.  Judges must be vigilant and independent in reviewing petitions for the writ." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 780 (2011).  Prominent in this Court's review of the evidence is that Cleveland claims he is innocent of the murder for which he has served nearly twenty years.  His claim of innocence has not been taken lightly.

This Court has heeded the mandate of the Sixth Circuit on remand, conducted an evidentiary hearing where it had the opportunity to assess the credibility of the witnesses, and considered the evidence and the merits of Cleveland's claims de novo  At the end of the day, what is left of the four pieces of evidence the Sixth Circuit cited in support of Cleveland's gateway actual innocence claim? The key evidence, the Dehus affidavit concerning blood evidence at the Epps crime scene, has been proven unreliable by subsequent testing showing the blood could not be from Blakely.  This in turn renders the flight records, presented at trial, less relevant because the time frame for Blakely's death is no longer constrained in light of this new DNA evidence.  And, the prosecutor's theory against

62

Cleveland has always been that he drove to Lorain.  Further, this Court found unreliable Donaphin's testimony that he saw Cleveland on the evening of August 7.

That leaves only Avery's recantation of his trial testimony.  As discussed above, this Court has extensively reviewed all of the statements Avery has made since Blakely's murder and finds his trial testimony reliable and, importantly, supported by corroborating physical evidence, which law enforcement credibly testified they had not divulged to Avery prior to this statement.  In reaching this conclusion, this Court had the benefit of witness testimony about the circumstances under which Avery gave his various statements.

Beyond the gateway evidence cited by the Sixth Circuit, this Court also had the benefit of viewing firsthand the testimony of Cleveland and other witnesses about the events of August 7–8, 1991.  Simply put, Cleveland's claim of innocence for his involvement in Blakely's murder is not borne out by the evidence.

Finding no basis for relief, the Amended Petition (Doc. 34) is denied.  Further, because this Court finds Cleveland has not made a "substantial showing of the denial of a constitutional right," it declines to issue a certificate of appealability.  *See* 28 U.S.C. § 2253(c).

IT IS SO ORDERED.

_____s/ *Jack Zouhary*_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

December 12, 2014